(No. 23804.—

THE SOUTH CHICAGO COAL AND DOCK COMPANY, Appellant, *vs.* THE ILLINOIS COMMERCE COMMISSION *et al.*— (THE COMMONWEALTH EDISON COMPANY, Appellee.)

*Opinion filed December 10, 1936—Rehearing denied Feb. 5, 1937.*

ELDER, PEDDERSON & WEDEL, (EDGAR B. ELDER, and JOHN E. PEDDERSON, of counsel,) for appellant.

ISHAM, LINCOLN & BEALE, (DAVID F. TABER, of counsel,) for appellee.

OTTO KERNER, Attorney General, ROBERT H. FARRELL, and EUGENE L. COHN, for the Commerce Commission.

Mr. JUSTICE ORR delivered the opinion of the court:

The validity of a judgment of the superior court of Cook county which affirmed an order of the Illinois Commerce Commission is questioned by this appeal. The sufficiency of the evidence to support the finding and order of the commission is the principal issue.

The appellant, the South Chicago Coal and Dock Company, (hereafter referred to as the dock company,) operates a retail coal yard in Chicago. Cargoes of coal are received from lake ships which moor alongside its wharf. The coal is transferred to the premises of the dock company by its electrically operated coal bridge. Electric current to operate the bridge and other appliances of the dock company is furnished by the appellee, the Commonwealth Edison Company, (herein called the Edison company.) This coal bridge is a highly specialized mechanical structure 465 feet long which spans the yard of the dock company. It serves a large area of the coal yard, because it can be mechanically moved upon two narrow-gauged tracks. One end of the bridge abuts upon the dock face. After a loaded ship is docked an apron of the bridge is lowered over a hatch, a grab-bucket with a capacity of six tons descends into the hold and loads itself. The loaded bucket is lifted to a height determined proper by the bridge operator. It is then moved horizontally along the bridge structure by a racking trolley to a selected place, where the bucket is lowered and the contents dis-

charged. When the coal bridge was installed, in 1926, the dock company started negotiations with the Edison company for electric power. A contract was entered into which provided for the payment of two distinct types of remuneration to the Edison company. The first was for the electrical energy actually furnished, the amount of which was ascertained by a watt-hour meter installed in the yard. This is known in the electrical field as the "energy" charge. The second is known as the "maximum-demand" charge and is designed to reimburse the Edison company for certain fixed charges, such as investment, interest, depreciation, taxes, etc. The contract provided the maximum-demand charge could be determined by a meter. It contained a special provision, however, in respect to the maximum-demand charge, which allowed the Edison company to determine the maximum demand charged by other means if more than one-quarter of the dock company's electrical equipment did not operate continuously but intermittently and the electrical load imposed was of a violently fluctuating character. The special provision reads: "The customer's maximum demand will be determined by maximum-demand instruments. The maximum demand of electricity supplied in any month shall be the average number of kilowatts indicated or recorded in the thirty-minute interval in such month in which interval the consumption of electricity hereunder is greater than during any other thirty-minute interval in such month.

*"Intermittent Equipment.*—In the case of welding machines, X-ray machines, hoists, and similar apparatus, where the use of electricity is intermittent and subject to violent fluctuations, and where the rated capacity of the intermittent equipment is more than twenty-five per cent of the aggregate rated capacity in horse power of the motors and other non-intermittent power-using equipment installed on the premises, the electricity supplied to such

intermittent equipment must be metered and billed independently under a separate contract in accordance with the company's rate 'B' or rate 'C,' as the customer may elect; provided, however, that in such case the maximum demand, for any month, of such intermittent equipment shall be taken to be seventy-five per cent of its aggregate rated capacity. The company further reserves the right to require the customer to provide at his own expense suitable apparatus to reasonably limit such intermittence or fluctuation, where in the company's judgment such apparatus is necessary to prevent undue interference with the service of the company."

The dispute between the litigants arose because the Edison company believed the electrical load imposed upon its system by the operation of the bridge to be of violent fluctuation through equipment operated intermittently. It therefore gauged the maximum demand to be seventy-five per cent of the aggregate rated capacity of the intermittent equipment. It defined the coal bridge as a hoist. The views of the dock company, as stated in its petition, were, in substance, that it was wholly uninformed upon electrical subjects, as was known to the Edison company, and it became the duty of the latter to counsel and advise it as to the type of service and equipment, so it would receive the best type of service at the most reasonable rate; that the Edison company advised the installation of certain equipment on the dock company premises and at the latter's cost, and subsequently it was found that the advice was not impartial but was for the benefit of the Edison company. The dock company charged the Edison company with misrepresenting the contract for power known as form "C-1" as the most advantageous one and keeping still about form "C-3," which was cheaper, for it was an off-peak contract. When the dock company kept objecting to the size of its bills, the Edison company, in October, 1932, first suggested such form of contract. The

petitioner further charged a failure on the part of the Edison company to make tests to determine the maximum-demand charge in fact, and that its estimate thereof at 400 k.w. was excessive by fifty per cent and violated the rates set by the commission and is a higher rate than is charged other industries similarly situated. The estimated demand is alleged to be based upon the intermittent-power rating of motors on the yard premises, including the coal bridge. The largest motor is the hoist motor on the bridge, which has a rated capacity of 300 h.p. out of the whole rated capacity of 752½ h.p. Since the other motors have a lower rating and are operated consecutively and not simultaneously, the Edison company is charged with error in estimating the maximum demand on the entire connected load of 752½ h.p. An unlawful discrimination is charged because other power consumers of the Edison company in the immediate vicinity of the dock company premises are said to get electric power for the operation of equipment similar in character to that of the dock company, with their maximum demand measured by meters and not estimated. Because it was not made an "off peak" customer the dock company charges it is entitled to a money return for overcharges and because its maximum demand was rated on a wrongful basis of 400 instead of 200 k.w.

The complaint specifically asked the commission to do the following: "(1) Fix the maximum-demand charge to be made to complainant at such amount as the evidence shall indicate is fair and reasonable, or that respondent may be directed to install a demand meter on complainant's premises for the purpose of measuring complainant's maximum demand; (2) that respondent may be directed to place complainant in the classification of an off-peak customer and make its charges to complainant based upon its schedule for such classification on file with this commission; (3) that complainant may be awarded

reparations against respondent in the amount of $25,000 for losses and damages sustained by complainant because of the over-charges aforesaid, together with lawful interest thereon; and (4) that the commission may enter such other orders and give to complainant such further relief in the premises as to the commission shall seem meet." The Edison company answered in a manner that amounted to a general denial. After the hearing the commission found against the dock company on all points and dismissed the complaint.

The commission found from the evidence that the plant of the dock company consisted essentially of a dock, yard, storage facilities, and an apparatus for the handling of coal and other materials. The principal item of equipment, in so far as the use of electric current was concerned, was the coal bridge. The demands upon the lines and system of the Edison company by the operation of the coal bridge was the determining factor in establishing the electrical characteristics of the dock company's load. The electrical service was established under a contract for electric service under a rate known as "C-1" and is particularly affected by the so-called intermittent clause contained in that rate. The Edison company has billed and collected charges in accordance with that clause. The commission found the Edison company was not required, under the intermittent clause, to place demand-measuring instruments on the dock company service, but, on the contrary, held that the electrical demand was required to be determined with respect to the rated capacity of the motor operating the equipment. While the demand for billing purposes was fixed at 400 k.w., the intermittent clause was not worded in such manner that a determination of the billing demand was free from the elements of judgment and possible controversy. The commission found that the Edison company in determining the 400 k.w. demand did not act in an unfair or discriminatory manner. The coal bridge, according to the commission, is

sufficiently similar, in the characteristics of its use of electricity, to a hoist as to come within the language and intent of the intermittent-equipment clause. It further found the coal bridge made use of electric current intermittently in point of time, and when it did use it there were violent fluctuations in the demand upon the equipment of the Edison company. The difference in demand occasioned by the operation of the coal bridge fluctuated in a one-minute period between approximately zero and 1000 k.w., the average demand being approximately 270 k.w. The commission explicitly found that the evidence failed to establish the dock company was over-charged or had been discriminated against in favor of other consumers of the Edison company or that the maximum-demand charge made in connection with the operation of the coal bridge and other facilities of the dock company was unreasonable.

An application for a rehearing filed by the dock company enumerated twenty-eight alleged errors, but in view of matters abandoned and points briefed and argued in this court we do not deem it necessary to treat the petition in detail. For the purposes of this review it is sufficient to say that the application for rehearing questioned the order of the commission as resting upon findings which had no substantial foundation in fact or law so far as concerns the applicability of the intermittent-equipment clause of the rate form "C-1," and further charged as erroneous the finding of the commission respecting the alleged arbitrary discrimination between consumers. The petition was denied and an appeal was taken to the superior court, where the commission's order was sustained upon all matters.

This court has limited its inquiry in an appeal from the commission to a determination of three questions: (1) Did the commission act within the statutory powers given to it; (2) is there substantial foundation in the evidence upon which the commission could base the order; and (3) has a constitutional right been violated. (*City of Chicago* v. *Com-*

*merce Com.* 356 Ill. 501.) In reviewing a case of this nature the duty does not devolve upon us to re-try the case upon its merits and substitute our judgment for that of the commission. Orders of the commission are entitled to great weight, for they arise out of the deliberations of its members, who are much better qualified to interpret the testimony and charts of specialists and technicians. We will not set aside a commission order unless it is arbitrary or unreasonable or in clear violation of a rule of law. Basically, a review of commission orders by this court is to keep the commission within its jurisdiction, so as not to violate any rights given by the constitution. When the sufficiency of the evidence to support an order of the commission is questioned the order will not be set aside unless it is clearly against the manifest weight of the evidence. *Commerce Com.* v. *Chicago and Eastern Illinois Railway Co.* 332 Ill. 243.

Whether the intermittent-equipment clause is applicable to the service situation of a dock company presents a factual question of an administrative nature. It is the duty of the commission, under the Public Utilities act, (Smith-Hurd Stat. 1935, chap. 111⅔,) to see that a public utility, because it is obligated by the nature of its business to furnish service or commodities to the general public it serves, does so without arbitrary discrimination, and it must, to the extent of its capacity, serve all who apply, on equal terms and without distinction. *Springfield Gas Co.* v. *City of Springfield,* 292 Ill. 236; *People* v. *Cemetery Co.* 258 id. 36.

To properly understand and evaluate the evidence regarding the applicability of the intermittent-demand clause to the operation of the coal bridge it is necessary to discuss in some detail the operation of that piece of equipment. The coal bridge is equipped with fifteen motors, only two of which function continuously during the operation of the bridge—a motor running an air compressor and a motor operating a generator which converts some alternating cur-

rent into direct current used in the control apparatus of the bridge. These two motors are small units and are nowise determinative of the question. Twelve other motors on the bridge are for occasional use, only, and in practice only four of the motors on this structure operate simultaneously or in an overlapping manner, they being the compressor and generator motors before mentioned, the bucket-hoist motor and the trolley-racking motor. The bucket-hoist motor has an intermittent rating of 450 h.p., while the trolley-racking motor, which is used to move the bucket horizontally, under the same type of rating is 225 h.p. The cycle of operation of the coal bridge when properly divided into individual operative actions is as follows: The dropping and spotting of the bucket in the ship-hatch, one second of time; closing the bucket around its load, five seconds; hoisting the loaded bucket vertically to a height necessary to clear certain structural parts of the coal bridge, ten seconds; racking the bucket to the coal pile where its load is to be deposited, thirteen seconds; discharging the load, two seconds; racking the bucket back to the boat, fourteen seconds, and lowering the grab-bucket to the hatch, eight seconds. This makes a cycle of fifty-three seconds as the sum of the individual operations. It is possible, but as a matter of practice not generally done, to operate the hoist and racking motors simultaneously, thus making the bucket travel a path through the air which is the resultant of the application of those two forces to the load. This is so rarely done, or takes such a small portion of the time cycle, that it may be disregarded in computing the load demand. The maximum demand upon the service and equipment of the Edison company during the operation of the bridge comes when the bucket is grabbing its load in the hold of the ship and is afterwards hoisted vertically to a height where the horizontal motion of the bucket commences. There are certain parts of the cycle of operation where the demand upon the service and equipment of the Edison company is

almost zero. The electrical characteristics of the load imposed upon the service and equipment of the Edison company can be, and was, graphically represented upon calibrated charts by means of an electrical load-measuring device. This instrument,. which graphically records the loads, is known as an Esterline graphic meter. The interpretation of the graphic charts recorded by this meter of the electrical characteristics of the load imposed by the operation of the coal bridge upon the service and equipment of the Edison company and charts of the electrical loads of other industries upon the same loop circuit is a matter of violent dispute between witnesses for the dock company and the Edison company. From the points briefed and argued by the dock company in this court it is apparent that it admits the electrical load imposed upon the power-generating and service equipment of the Edison company by the operation of the coal bridge is a violently fluctuating one. After a review of the record we are convinced that the commission was justified in holding that the dock company in the operation of the coal bridge exceeded the twenty-five per cent limitation on intermittent equipment, and that the use of such intermittent equipment imposed violently fluctuating loads upon the power-generating and service equipment of the Edison company.

In our view the most serious question presented by this appeal is the charge that the Edison company unlawfully discriminated between the dock company on one hand and other named power users in the same district on the other. However, the commission had before it for inspection certain graphic-charts which separately reflected the intermittent electrical loads imposed by the dock company and the others upon the power-generating and service equipment of the Edison company. The information impressed upon these charts by the recording apparatus is not readily apparent to one not versed in the science and technicalities of electricity. Each of the companies litigant, as might be

expected, questioned the veracity of the other's interpretations of these charts. Both sides produced experts as interpreters of the charts, and from this welter of highly conflicting interpretative opinions the commission reached its conclusion, viz.: "The evidence, in short, does not establish that any of the other customers referred to in these proceedings have more than twenty-five per cent in rated capacity of electric motors operating equipment of the character and type described in the intermittent clause contained in respondent's rate C-1."

The contention of the dock company that this court has the power and duty to delve further into the evidence in order to determine the merits of the controversy where the commission has allegedly reached findings contrary to the manifest weight of the evidence is not applicable under the circumstances. It is, in effect, asking this court to re-try the case upon its merits. Simply because the commission by its findings believed the interpretation placed upon the charts by one set of witnesses does not warrant this court in conducting what would amount to a *de novo* proceeding. Furthermore, to show the weakness of the contention under the circumstances before us, we would necessarily be substituting the judgment of seven men who are not fortified with the requisite specialized knowledge in place of the judgment of commission members who are by training and experience equipped to decide the factual questions presented herein.

Our support of the commission in its findings that the dock company comes within the intermittent-equipment clause and the other industries do not, disposes of any questions of unlawful discrimination and demands for restitution of alleged over-charges. No reason is apparent in the record which would justify us in setting aside the findings and order of the commission.

The judgment is affirmed.      *Judgment affirmed.*