LEFTON IRON & METAL COMPANY, Plaintiff-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 87—2407

Opinion filed August 16, 1988.—Rehearing denied October 7, 1988.

Richard S. M. Emrich, of Belnap, Spencer, McFarland, Emrich & Herman, of Chicago, for appellant.

Douglas W. Trabaris, of Chicago, for appellees.

JUSTICE EGAN delivered the opinion of the court:
This is an appeal from a judgment of the circuit court affirming an order of the Illinois Commerce Commission the effect of which was to approve a railroad rate increase.

Before the issues may be identified, it is necessary to set out the applicable law. Before October 1, 1980, the Illinois Commerce Commission (Commission) had full jurisdiction to require that Illinois intrastate rail rates be maintained at reasonable levels. On that date, the Staggers Rail Act of 1980 went into effect (49 U.S.C. §11501 *et seq.* (1982)) and preempted State jurisdiction to regulate intrastate railroad rates unless it first be shown that the railroad exercised "market dominance" over the transportation to which the rate applied. (49 U.S.C. §§10701(a), (b), 10709 (1982).) Market dominance means "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." (49 U.S.C. §10709(a) (1982).) Section 10709(d) creates an irrebuttable presumption that a railroad does not have market dominance if the railroad proves that the rate charged results in a revenue-variable cost percentage that is less than a specified amount, in this case 180%. (49 U.S.C. §10709(d) (1982).) "Revenue-variable cost percentage" is defined as the "quotient, expressed as a percentage figure, obtained by dividing the total revenues produced by the transportation of all traffic received by rail carriers for rail transportation by the total variable cost of such transportation." (49 U.S.C. §§10709(d)(1)(B)(ii), (2) (1982).) The defendant Terminal Railroad Association of St. Louis (TRRA) introduced evidence before the defendant Illinois Commerce Commission (Commission) that the proposed rate would result in revenue of $404 per car and that its variable cost was $249.54 per car, thereby seeking to establish a revenue-variable cost percentage of

162%. The plaintiff, Lefton Iron & Metal Company (Lefton), introduced evidence that the variable cost was not $249.54 but approximately $187.69, which would produce a revenue-variable cost percentage of 312%. The Commission adopted the figures of TRRA and concluded that since the revenue-variable cost percentage was less than 162% and was below the jurisdictional threshold percentage in the statute, the rate was deemed reasonable. The issues are whether the Commission's findings were against the manifest weight of the evidence, were legally insufficient, were inconsistent or manifested confusion on the part of the Commission.

Lefton is a processor and vendor of scrap metal located in East St. Louis, Illinois, and makes 50% of its sales to a single customer, Granite City Steel Division of National Steel Corporation (Granite) at Granite City, Illinois. TRRA is a switching railroad which services the Granite plant and is the only railroad with lines that reach the Lefton plant.

Lefton competes with nine other scrap processors for Granite's business and is one of Granite's four "principal suppliers." Two of the other three are located on the Missouri side of the Mississippi and are also served by TRRA. The third other supplier is located on the grounds of the Granite plant and is not served by TRRA.

On June 10, 1985, TRRA filed a tariff with the Commission which would increase the rate Lefton paid for transporting scrap to Granite. Before the effective date of the tariff, TRRA had been operating under lower rates for transporting scrap metal from East St. Louis to Granite. That rate was $237.50 per car, which the plaintiff factored to be $3.39 per net ton. At the same time, the rate from Missouri to Granite was $7.05 per net ton. TRRA claimed that its out-of-pocket variable costs were $249.54 per car, resulting in a net loss per car of $12.04 for each car transported from Lefton to Granite. TRRA stated that it performed the same function and covered the same distance in transporting Lefton's intrastate load as it did transporting the Missouri scrap dealers' interstate loads to Granite. Therefore, it issued the same rate of $404 per car for both interstate and intrastate hauling. The new tariff averaged to $5.53 per net ton, which was an increase to Lefton of 63.25%. The rate to the Missouri vendors decreased 21.50% from $7.05 per net ton. Although Lefton referred to the rate adjustments of the Missouri customers, it acknowledges that only the reasonableness of the Illinois increase was before the Commission. The other rate adjustments were interstate and thus subject to the Interstate Commerce Commission.

Pursuant to 92 Ill. Adm. Code §1580.90 (1985), Lefton filed a

timely protest and petition for suspension and investigation with the Commission. The Commission declined to suspend the increase but did order that the reasonableness of the rate be investigated. That investigation was done through a hearing. Prehearing discovery was available to representatives of the Commission and the parties.

TRRA's sole witness was Charles Cross, its vice-president for traffic, real estate and tax. As vice-president of traffic, his duties involved the solicitation of freight and pricing of TRRA's services and included setting rates and tariffs. He was not an accountant, but had prepared actual cost studies and appeared before the Illinois and Missouri commissions on prior occasions. He described each step in the operation, beginning with the departure of the cars from the switching yards of the Norfolk & Western or Missouri Pacific Railroads in St. Louis, Missouri, to Madison, Illinois, to Lefton's premises for loading, back to Madison, then to Granite for delivery, back to Madison and then back to St. Louis. The cost of each step was described; and he testified that the total variable costs were $249.54 per car.

Two witnesses testified for Lefton. Gerald W. Fauth was the vice-president and senior cost analyst for a transportation and economic consulting firm specializing in cost analysis. He disagreed with some of Cross' testimony and criticized his analysis. In sum, he said that while Cross underestimated certain expenses, he overestimated others and the overestimates outweighed the underestimates.

Norman Lefton is an economist and since 1975 had been chairman of the plaintiff board. Most of his testimony was directed to the detrimental impact the increased rate would have on Lefton's operation. He said that the effect of the rate increase on his company was relevant to the issue of its reasonableness.

The hearing officer found that TRRA had "convincingly" met its burden of showing that the variable cost per car for the movement of scrap was $249.54. At a revenue rate of $404 per car, the revenue-variable costs percentage was 161.89%. The Commission adopted the hearing officer's proposed order, and the circuit court affirmed the Commission.

■ Lefton first contends that the order is defective because it did not make an express finding on the question of market dominance. We disagree. The pertinent portions of the order are as follows:

> "(5) 92 Ill. Adm. Code 1580 requires that the Commission, within 90 days after the start of a proceeding, make a determination whether or not [TRRA's] rate has market dominance over the transportation to which its rate applies;
>
> (6) 49 U.S.C. 10709(d)(2) requires that the Commission de-

termine if the revenue-variable cost threshold percentage level is equal to or above 180 percent; a finding that the revenue-variable cost percentage is less than 180 percent shall be conclusive evidence that the rate is reasonable and no market dominance exists;

(7) respondent met its burden of proof by convincingly showing that its variable cost per car for the movement of scrap was $249.54 at a revenue rate of $404 per car to produce a revenue-variable cost percentage of less than 162 percent;

(8) the revenue-variable cost percentage of the rate under investigation is less than 162 percent, and is below the jurisdictional threshold percentage cited in 49 U.S.C. 10709(d)(2); therefore, the rate is deemed reasonable."

That language makes clear to us that the Commission found no market dominance, and any further express finding of lack of market dominance would be surplusage.

■ Lefton in the same vein contends that the findings are inconsistent because they purport to make a finding of no market dominance on the one hand and a finding that the rate was reasonable on the other. It reasons that, since the Commission made a finding that the rate was reasonable, it necessarily follows that the Commission found that it had jurisdiction. We do not read the order in such a strained manner. The order (paragraph 6) recites that the statute requires that the Commission make a finding as to the revenue-variable cost percentage, and if it finds the percentage to be less than 180%, *that finding* would be conclusive evidence that the rate was reasonable and no market dominance existed. Paragraph 8 said that the rate was "deemed reasonable" because the Commission found the revenue-variable cost percentage was less than 162%. We read the order to mean that the rate was reasonable by operation of law and not because the Commission made a separate finding of fact. If there be any doubt as to the Commission's recognition of its role, we refer to page 2 of the order in which it expressly states that if the Commission finds that the "rate [sic]" did not have market dominance, "the Commission shall not make a determination on the issue of reasonableness."

Lefton continues its attack on the order with the assertion that the Commission's findings were not "explained sufficiently to permit the reviewing court to understand or evaluate the basis of the Commission's action." It maintains that the Commission made no findings to show what evidence it relied on or how it resolved any evidentiary issues. It argues that the only finding made by the Commission which

supported its finding that the revenue-variable cost percentage was less than 162% was as follows:

"[TRRA] presented evidence to show that the variable cost per car it incurred in a typical movement of freight from Intervenor's facility in East St. Louis to Granite City Steel is $249.54. This cost figure includes 12 separate elements which constitute each movement involved in the shipping cycle."

The thrust of Lefton's argument is that the Commission ignored Lefton's evidence. The record is to the contrary. The order expressly points out that Lefton submitted a cost witness who used regional cost data based on a particular rail form, that the rail form showed the operating expenses of 21 class I western railroads and the average cost of the line-haul railroads of the western district. The finding noted that TRRA was a class III carrier but that some of the operating data of class III railroads were included in the rail form. The order also pointed out that Lefton contended that the revenue variable cost percentage of the rate under investigation was 360.42%. Even if there were no reference to Lefton's evidence, it would not be inferable that the Commission ignored such evidence because the order did not comment on it. *Chicago North Shore & Milwaukee R.R. Co. v. Illinois Commerce Comm'n* (1933), 354 Ill. 58, 188 N.E. 177.

■ Lefton seems to be saying that the Commission was required to explain in detail why it was accepting the testimony of TRRA's witness and rejecting the testimony of Lefton's witnesses. The statute provides that the Commission shall make and render findings concerning the subject matter and facts inquired into and enter its order based thereon. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—110.) The statute has been construed to mean that the order must sufficiently set forth the facts found which form the basis for the order to enable a court to intelligently review them on appeal. (*Knox Motor Service, Inc. v. Illinois Commerce Comm'n* (1979), 77 Ill. App. 3d 590, 396 N.E.2d 280.) The Commission, however, is not required to make particular findings as to each evidentiary fact or claim. *United Cities Gas Co. v. Illinois Commerce Comm'n* (1970), 47 Ill. 2d 498, 265 N.E.2d 608.

In *Colorado Interstate Gas Co. v. Federal Power Comm'n* (1945), 324 U.S. 581, 595, 89 L. Ed. 1206, 1219, 65 S. Ct. 829, 836, the court upheld the Commission's order reducing power companies' rates over a challenge by those companies that the Commission's findings on the allocation of costs were inadequate, saying this:

"The findings of the Commission in this regard leave much to be desired since they are quite summary and incorporate by

reference the Commission's staff's exhibits on allocation of costs. But the path which it followed can be discerned. And we do not believe its findings are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process."

One of the cases cited by Lefton militates against it. In *Public Utilities Comm'n v. Federal Power Comm'n* (1953), 205 F.2d 116, 119-20, the court rejected the argument that the Commission must annotate to each finding the evidence supporting it. The court held that the Commission need not disclose its "mental operations" by which the decision was reached.

■ In this case the statute required a "finding" only as to market dominance. The Commission made such a finding when it found that the revenue-variable cost percentage was below 162%. It also made the requisite supporting finding that the cost per car was $249.54. The Commission noted that TRRA offered evidence in support of its figures and that Lefton submitted evidence in opposition. The order expressly stated that the Commission considered all of the evidence in the proceeding, and it found that TRRA had "met its burden of proof by convincingly showing its variable cost." The findings of the Commission provide this court a path which it can follow and are legally sufficient.

The last contention of Lefton is that the finding that TRRA had met its burden of proof is against the manifest weight of the evidence. It argues that no weight should have been given to the testimony of TRRA's witness, Cross, because of lack of qualifications as a rail-cost analyst, that improper cost methodology had been followed, that TRRA had better evidence available but did not use it, that Lefton showed errors in Cross' testimony, that TRRA's cost evidence failed to distinguish between interstate and intrastate rail movements and that TRRA's evidence "was rebutted by Lefton's better evidence."

■ With regard to the competency of Cross, we note that no error is assigned here to the fact that Cross testified as an expert nor was it assigned in the petition for rehearing. An objection on that basis was made at the hearing but was overruled. Rather, the apparent argument is that his qualifications were such that his testimony is entitled to little or no weight. We do not agree that his qualifications, or alleged lack thereof, render his testimony unacceptable as a matter of law. He had been employed with the railroad since 1939. From 1948 he had been involved in the traffic portion of his duties. As vice-president of traffic his duties include the solicitation of freight and pricing

of services and pertain to rates and tariffs. He had testified on a number of occasions before the Illinois Commerce Commission and the Missouri Public Service Commission. We agree with the ruling of the hearing officer that he was qualified to testify as an expert witness.

■ Next Lefton argues that Cross used improper methodology in computing variable costs. It says that several cost-finding formulas have been developed by the Interstate Commerce Commission and the "accepted" standard methodology of a railroad such as TRRA is known as Rail Terminal Form F, although Rail Form A (RFA), the form used by Lefton's expert, Fauth, is acceptable but less reliable. It concludes that the Commission accepted the defendant's methodology, which has no "approval in the case law, the profession or the record," and thus erred.

The method used by TRRA was based on actual cost it had incurred, while the method used by Lefton was based on average costs incurred by other carriers. Lefton has not pointed us to any case holding that the actual cost method is not acceptable. The case cited by Lefton, *Commonwealth Edison Co. v. Aberdeen & Rockfish R.R. Co.* (1986), 2 I.C.C.2d 642, decided June 19, 1986, is not on point. In that case, the issue was whether the Commission should permit the government to file certain work papers it concededly should have filed at the hearing level.

The Interstate Commerce Commission has held that it has not restricted the application of cost data to any particular formula; it requires only that the formula be based on recognized cost-finding procedures. (*Malt Liquors from Missouri, Illinois & Nebraska to Oklahoma* (1960), 310 I.C.C. 93, 98.) Fauth, Lefton's own expert, testified that it would be more accurate to use actual costs rather than the average cost of RFA. His quarrel was not with the methodology used by Cross but with what he contended were factual errors in Cross' analysis. We must defer to the expertise of the Commission in its determination that the cost methodology followed by TRRA was acceptable.

■ Lefton also maintains that Cross' testimony relied in part on data he received from others (the clerk, the railroad's general manager and the company comptroller) who were not called to testify. Lefton contends that these other preparers were required to be at the hearing before the rail-cost evidence would be acceptable, citing *Glass Bottles from Muskogee, Oklahoma to Chicago* (1964), 323 I.C.C. 258, 260-61. In that case, however, a party submitted a summary of costs prepared by a nonparty who was not called to testify. The Commission held that such a procedure was improper because the nonparty pre-

parers were not called for cross-examination. That case does not stand for the principle that each person who gathers some of the data must testify. The data referred to in this case was prepared in the ordinary course of business by other agents of TRRA. Moreover, during the hearing before the Commission, Lefton did not object on that basis nor was the issue raised in Lefton's petition for rehearing. The issue, therefore, is waived. *City of Granite City v. Illinois Commerce Comm'n* (1950), 407 Ill. 245, 95 N.E.2d 371.

■ Lefton also contends that TRRA should not have included interstate costs in averaging its costs without a detailed analysis to prove that the costs were the same. It is conceded by all that the only issue was the intrastate costs.

The initial complaint by Lefton alleged that the proposed rate constituted a burden on Illinois intrastate commerce and unreasonably cross-subsidized interstate commerce. Lefton's attorney examined Cross about interstate and intrastate expenses. He did so over the objections of TRRA on the ground of relevancy and in spite of the doubt expressed by the hearing officer of its admissibility. He insisted that the questioning was proper because he was attempting to show that the intrastate rate was structured in order to cross-subsidize interstate rates and was thus unreasonable. We agree that proof of interstate costs was irrelevant.

Lefton asserts that TRRA had previously done a more sophisticated cost study that was found acceptable by the Commission (*National R.R. Passenger Corp. & Terminal R.R. Association of St. Louis, Use of Tracks & Facilities* (1977), 348 I.C.C. 901), but elected not to use it here. That case involved the rental by TRRA to Amtrak of rails, facilities and attendant services at St. Louis' Union Station from 1972 to 1977 and is not relevant to the present rate petition.

■ Lefton next contends that multiple errors in TRRA's cost evidence render it lacking in probative value and lists 10 examples of what it contends are miscalculations on the part of TRRA. The Commission passed on each of them and rejected them. Unfortunately, neither TRRA nor the Commission has seen fit to answer these specific arguments, and this court has been required to examine the record. Lefton refers us to few references to testimony in the record; rather, it refers principally to the briefs that it filed before the Commission. It would unduly lengthen this opinion to refute each specific example of alleged miscalculation, but we will address the two principal ones. We reject all of them.

Lefton argued that TRRA claimed that the average round trip took 10.5 days and that actually the trip took five days. That argu-

ment is based on the testimony of Fauth that he examined the records relied upon by Cross, who had testified to a 10.5-day cycle, and that he concluded that the cars could complete the cycle in five days. However, he admitted on cross-examination that RFA, which he used, computes the distance traveled as six miles while the actual distance was 14 miles. He said that the six-mile figure was built into RFA and that RFA was difficult to adjust.

Another argument in which Lefton persists is that Cross improperly failed to consider demurrage as an offset against expenses. Demurrage represents a penalty charged to a shipper for holding a car too long. In support of this argument, Lefton inexplicably cites *Farmer's Export Co. v. Atcheson, Topeka & Santa Fe Ry. Co.* (1981), 364 I.C.C. 831, and *Switching at Corpus Christi, Texas* (1960), 311 I.C.C. 191. In *Farmer's Export* the Commission said, "Even assuming the accuracy of defendants' statistics, we have held that demurrage is not a proper offset to expenses." (*Farmer's Export*, 364 I.C.C. at 837.) *Switching at Corpus Christi, Texas* was expressly disapproved in *Switching & Minimum Carload Charges, Houston, Texas* (1975), 351 I.C.C. 146, 172:

> "The procedure followed, that of deducting the number of demurrage days from the switch days in computing total per diem charges, is in keeping with past practices. See *Switching at Corpus Christi, Texas*, 311 I.C.C. 191, 197. Demurrage is not a proper offset to expenses. To do so would be contrary to one of the purposes for which demurrage was intended, that is, as a penalty payment designed to discourage excessive detention. If protestants' contention were taken to the extreme, demurrage could wipe out all car expenses and artificially depress rates. It might even be said that eliminating demurrage days from the computation of per diem days is likewise improper. However, if so, the error would merely serve to understate costs."

Finally, Lefton contends that its evidence was superior to that of TRRA. As we have indicated, Lefton's expert used RFA in an attempt to approximate TRRA's actual costs. The expense data contained in RFA consists of average cost data from class I railroads, such as the Atcheson, Topeka and Santa Fe, the Burlington Northern and Missouri Pacific. A class I railroad is one which has operating revenues and expenses in excess of $50 million. The 1984 operating revenues and expenses of the Atcheson, Topeka and Santa Fe were in the excess of $2 billion, the Missouri Pacific's were in excess of $1.6 billion, the Burlington Northern's were in excess of $3.49 billion and the Chicago, Milwaukee, St. Paul & Pacific's operating revenues and

expenses were in excess of $414 million. TRRA is a class III carrier and had operating revenues and expenses of only $34 million. Fauth conceded that for rate-making purposes the study of actual costs incurred is preferable to the use of averages. He did not conduct any study of the shipping movements at issue. As we have previously pointed out, his testimony was based on a six-mile cycle while the actual cycle consisted of 14 miles. In addition, he included demurrage as an offset against expenses. The Commission had more than ample reason to prefer the evidence of TRRA to that of Lefton.

In sum, our response to this final argument on the sufficiency of the evidence is that the credibility of expert witnesses and the weight to be given their testimony are matters for the Commission as the finder of fact. Decisions of the Commission are entitled to great deference because they arise out of the deliberations of members who are much better qualified to interpret evidence supplied by specialists and technicians. (*South Chicago Coal & Dock Co. v. Illinois Commerce Comm'n* (1936), 365 Ill. 218, 6 N.E.2d 152; see also *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1971), 50 Ill. 2d 35, 276 N.E.2d 330.) Since decisions concerning market dominance are particularly within the expertise of the Commission, court review of such decisions must be particularly deferential. (*Aluminum Co. of America v. Interstate Commerce Comm'n* (D.C. Cir. 1985), 761 F.2d 746.) We cannot say that the order of the Commission is clearly against the manifest weight of the evidence.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

HARTMAN, P.J., and BILANDIC, J., concur.