METRO UTILITY, Appellant, v. THE ILLINOIS COMMERCE COMMIS-
SION, Appellee.

Second District   No. 2—89—0592

Opinion filed January 19, 1990.

Myler, Ruddy & McTavish, of Aurora (G. Alexander McTavish, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, and Rose Claggett, of Illinois Commerce Commission, both of Springfield (John P. Kelliher, Special Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE INGLIS delivered the opinion of the court:

Appellant, Metro Utility Company (Metro), is a public utility pro-

viding sewer and water service to approximately 4,000 customers in northeastern Illinois. On November 20, 1987, Metro filed with appellee, the Illinois Commerce Commission (Commission), its revised rate schedule sheets in which it proposed changes in rules, regulations and conditions of service applicable to water and sewer extensions and sewer connection fees. Specifically, Metro proposed to increase its sewer expansion fee from $200 per population equivalent (PE) to $875 per PE. A population equivalent is one person for sewage design purposes and requires 100 gallons per day of sewage treatment capacity. A single-family residence has a PE of four and requires 400 gallons per day of capacity. Thus, the current rate is $200 per PE or $800 per single-family residence which Metro proposed to increase to $875 per PE or $3,500 per single-family residence. Of the proposed $875 per PE, Metro intended to apply $475 to help offset its increased income tax liability as a result of the Tax Reform Act of 1986 and the remaining $400 to the building of sewage treatment facilities.

On November 22, 1988, the Commission issued an order which, among other things, denied Metro's proposed rate changes and directed Metro to maintain its current rates. On May 17, 1989, the Commission issued an order on rehearing in which it affirmed its original order. Metro filed this timely appeal seeking reversal of the Commission's decision. On appeal, Metro does not contest the Commission's ruling denying the increase sought to offset tax liability. Rather, Metro argues that the Commission's determination that Metro was not entitled to any increase for the purpose of building additional sewage treatment facilities was not supported by substantial evidence and, therefore, should be reversed. We disagree and affirm the order of the Commission.

Metro was formed in the early 1980s by consolidating seven smaller utility companies. The vestiges of the original companies remain as service territories now served by Metro. One such territory is the Chickasaw Hills service area. This area is serviced by two sewage treatment plants, a north plant and a south plant. The controversy in the case at bar concerns the north plant, which Metro contends is nearing its design capacity of 700,000 gallons per day and can presently only accommodate 300 new customers. An additional 500,000 gallons per day of sewage treatment capacity must be built in order to service the projected 1,500 new residential customers. Thus, the question presented is what will it cost to attain the 500,000 gallons per day either by adding that capacity to the existing north plant or building an entirely new sewage treatment plant.

At the original hearing, Metro presented one witness, Mr. Harold A. Ritke. Ritke, the president of Metro, testified that the average utility construction costs have more than doubled over the past 12 years when the current $200 connection fee was established. Ritke's opinion was based upon the Engineering News Record, which is an engineering technical magazine that keeps records of material, labor and construction costs for general heavy construction projects. Ritke estimated that the cost of expanding the sewage treatment plant (STP) facilities for the Chickasaw Hills and Valley Water divisions is between $2.4 million and $3 million. (Valley Water is one of the seven smaller utility companies consolidated by Metro which is also reaching its design capacity.) However, Ritke later conceded that in order to even bring the Chickasaw Hills North plant up to current Environmental Protection Agency standards, it would cost an estimated $1.2 million.

A witness for the staff of the Commission (Staff), Roy A. King, rejected Ritke's use of the Engineering News Record figures. King testified that he analyzed the historical costs of adding capacity to the treatment plants in the Chickasaw Hills area in the years 1983 through 1987 and arrived at a figure of $1.20 per gallons per day of capacity added. King stated that Metro's annual reports to the Commission indicate that construction costs for STP capacity had increased only 10% over the past 12 years, not doubled as Ritke claimed.

Further, King testified to a telephone conversation with an employee of the Environmental Protection Agency wherein he was told that $2 per gallon per day was an appropriate figure to use. The conversation was supported by a letter which was later admitted into evidence over the objection of Metro. The letter was from Charles W. Fellman, a professional engineer employed as the manager of the facility process unit of the permit section of the Environmental Protection Agency. The letter was dated August 18, 1988, and provided "that in most instances such improvements can be made for $2.00 per gallon per day of capacity added or less." As an example of the costs required, the letter set forth two facilities. The first was Creve Coeur, Illinois, at a cost of $1.73 per gallon per day of capacity. The second was Robinson, Illinois, at a cost of $1.33 per gallon per day of capacity.

Applying the $2-gallon-per-day figure to the 500,000-gallons-per-day additional capacity necessary to the Chickasaw Hills area, King arrived at a cost of $1 million. Subtracting a reasonable company investment of 25% left $750,000 to be paid by new customers. Then,

using Metro's estimate of 1,500 projected new customers in the Chickasaw Hills area, King divided the $750,000 cost by 1,500 to get a required connection fee of $500 per home or $125 per PE. Thus, King concluded that the current $200 per PE connection fee, or $800 per single-family residence, would provide Metro with $200,000 more than necessary to finance the Chickasaw Hills expansion. Nonetheless, King adopted the $200-per-PE connection fee as reasonable and testified that it should not be increased.

After the hearings had concluded, the Commission denied Metro's proposed fee increases and held that Metro had "not provided sufficient cost data to determine reliable STP expansion costs." The Commission found that "Metro's use of the Engineering News Record as a cost basis for new facilities [was] not supported by the actual cost figures derived from Metro, and its predecessors, as set forth in the Annual Reports to the Commission." The Staff's analysis of design capacity was held to be "more accurate" and "quite reasonable." Further, the Commission found that connection fees should not be used to cure Environmental Protection Agency violations. Thus, the Commission ruled to deny Metro's proposed increases and held that the current connection fees should remain in effect.

In Metro's motion for rehearing, Metro alleged that it had commenced a series of negotiations to purchase six acres of land approximately 3,000 feet west of the Chickasaw Hills North Plant upon which to construct an additional sewage treatment plant. Metro claimed that the negotiations had progressed further since the time of the original hearing such that Metro was better able to provide definitive cost estimates of the project.

Specifically, Metro alleged that on December 29, 1988, it had entered into a three-party transaction under which Caldwood Development Corporation (Caldwood) would acquire from owner Helen Bolek the six acres needed for Metro's sewage treatment plant along with a 53-acre parcel which Caldwood intends to develop into a residential subdivision. Caldwood would then convey the six acres to Metro in exchange for Metro's agreement to serve the new 53-acre development without requiring any cash contribution to the building of sewage treatment plant facilities.

Metro introduced into evidence a full set of plans, specifications and cost estimates for the proposed plant. It was argued that the plant would provide 500,000 gallons per day of additional capacity in the Chickasaw Hills area for an additional 1,250 customers at a cost of approximately $2.7 million. Robert Wollschlager, a consulting engineer for Metro, reviewed the costs of the proposed plant and testi-

fied that they were reasonable. Metro argued that if the 1,250 customers were asked to pay the entire cost of the plant, the contribution fee would be $540 per PE or $2,160 per lot. At the rehearing, Metro reduced its request to $400 per PE or $1,600 per lot.

Staff objected to Metro's argument on two grounds. First, the Staff argued that Metro did not sustain its burden of proving that a *new* sewage treatment plant was needed in the near future. Staff contends that Metro is capable of expanding the present sewage treatment plant to meet its needs. In support of its contention, Staff referred to Metro's letter to the Environmental Protection Agency dated August 31, 1988, in which Metro advised the agency that the existing STP could be upgraded and expanded by 400,000 gallons per day.

Further, Staff maintains that even if it is concluded that additional equipment is needed to increase capacity at the Chickasaw Hills North Plant by another 500,000 gallons per day, the cost would be approximately $738,000. If that cost of expansion is divided by 1,500 customers, then each customer would pay $493 per lot or $123 per PE.

Second, Staff argued that Metro's proposal to be reimbursed for a new STP is premature. Staff supported this contention by pointing to the fact that the proposed property site had not yet been acquired by Metro; Metro has not applied to the Environmental Protection Agency for construction permits; zoning approval has not yet been obtained; no certificate of public convenience and necessity has been applied for by Metro; and an additional 300 customers can be connected to the Chickasaw Hills plant before it reaches current capacity.

On May 17, 1989, the Commission entered an order on rehearing affirming the original order. The Commission found that Metro failed to show an immediate need for a new STP and that the present plant is capable of serving existing and new customers for the next several years. Further, the Commission found that the $800-per-single-family connection fee, or $200 per PE, is adequate to meet the costs of expanding and upgrading the Chickasaw Hills North STP to serve new customers in the near future.

On June 15, 1989, Metro filed its notice of appeal with the Commission (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201) and its petition for review with this court (107 Ill. 2d R. 335). Metro maintains that the Commission's decision denying Metro any increase in fees was not supported by substantial evidence and, therefore, should be reversed.

Section 10—201(a) of the Public Utilities Act (Act) provides that any person affected by a final order or decision of the Commission may appeal to the appellate court "for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and determined." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(a).) On appeal, the Commission's findings of fact "shall be held prima facie to be true" and the decision of the Commission "shall be held to be prima facie reasonable." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(d).) The Act places upon the party appealing the Commission's decision the burden of proving all issues raised. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(d).) The appellate court is directed to reverse the Commission's decision if it determines that "[t]he findings of the Commission are not supported by substantial evidence." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(A).) "Substantial evidence" has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Black's Law Dictionary 1281 (5th ed. 1979); see also *Airport Shuttle Service, Inc. v. Interstate Commerce Comm'n* (D.C. Cir. 1982), 676 F.2d 836, 840.

Metro contends that the Commission's decision was not supported by substantial evidence. Metro argues that the testimony of Roy King, upon which the Commission relied, was faulty. King testified that a price of $2 per gallon per day was reasonable. In forming his opinion, King reviewed previous Commission orders involving Metro and its predecessors, annual reports of each operating division of Metro, work papers supplied by Metro, and information from the Environmental Protection Agency.

King testified that upon analyzing the historical costs incurred by Metro in adding capacity to the treatment plants in the Chickasaw Hills area in the years 1983 through 1987, he arrived at an average cost of $1.20 per gallon per day. Metro contends that "[t]his is not 'substantial' evidence upon which the Commission may base its decision" because the historical costs relied upon by King went "back to the early 1960s when the plant was first built." However, Metro does not cite to the record to support its allegations that 1960 figures were used. Nor was this argument raised in Metro's initial brief; it was only raised in Metro's reply brief. As such, we will not address Metro's contention on this point. 113 Ill. 2d R. 341(e)(7).

Metro also argues that the testimony of King was not "substantial" because King relied upon hearsay evidence improperly admitted. Specifically, Metro claims that the August 18, 1988, letter from

Charles W. Fellman, staff member of the Environmental Protection Agency, "is the rankest form of hearsay and inadmissible even in an administrative hearing." The Fellman letter stated that the probable cost of expanding a 700,000 capacity plant to 1,200,000 is "about $2.00 per gallon per day of capacity added." In support of this figure Fellman cited the cost of two similar facilities in Illinois. King testified that he accepted the $2 figure as reasonable.

Staff does not appear to contest Metro's argument that the Fellman letter is hearsay. Rather, Staff argues that the letter is admissible under the rules followed by the Commission. Section 10—101 of the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—101) provides that the Commission's hearings shall be governed by the provisions of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1987, ch. 127, par. 1001 *et seq.*). Section 12(a) of the Illinois Administrative Procedure Act provides in part:

> "The rules of evidence and privilege as applied in civil cases in the Circuit Courts of this State shall be followed. *However, evidence not admissible under such rules of evidence may be admitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 127, par. 1012(a).)

Section 4(a)(1) of the Illinois Administrative Procedure Act instructs each agency to adopt its own rules of practice for formal hearings. (Ill. Rev. Stat. 1987, ch. 127, par. 1004(a)(1).) The Illinois Commerce Commission has adopted the catchall evidence standard set forth in section 12(a). 83 Ill. Admin. Code §200.610(b) (Supp. 1987).

■ While hearsay evidence has generally been held to be inadmissible in an administrative hearing (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 509; *Daniels v. Retirement Board of the Policeman's Annuity & Benefit Fund* (1982), 106 Ill. App. 3d 412, 415), section 12(a) appears to create an exception to the rule when the hearsay is reliable. (*Fagiano v. Police Board* (1984), 123 Ill. App. 3d 963, 981; T. Mulroy, Jr., and D. McClure, *The Case for Allowing Hearsay in Illinois Administrative Proceedings*, 77 Ill. B.J. 552 (1989).) We believe the Commission accurately stated the pertinent question in determining the letter's admissibility as "whether a reasonably prudent person would rely on the written assurances of sewer connection costs put forward by a staff member of the [Illinois Environmental Protection Agency]." We believe that it was reasonable for King, in forming his opinion, to rely upon the information provided by the Agency. Thus, we find that the Commission was cor-

rect in admitting Fellman's letter into evidence.

However, even if the letter were inadmissible, it would not invalidate King's testimony. King, as an expert, could base his opinion on data not in evidence, including the opinions of others, so long as experts in the field ordinarily rely upon such data in forming their opinions. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 482.) Further, there was no prejudicial error in the allegedly improper admission of the evidence given that there was sufficient competent evidence to support the Commission's decision. (*Goranson v. Department of Registration & Education* (1980), 92 Ill. App. 3d 496, 501.) King analyzed the historical costs incurred by Metro and arrived at an average cost of $1.20 per gallon per day. $1.20 per gallon per day equals $120 per PE or $480 per single-family residence. The current fee is $2 per gallon per day, which is $200 per PE or $800 per single-family residence. Mr. Ritke, Metro's own expert witness, testified that the $2 figure could be reasonable. When examined, Ritke was asked, "In your opinion, is [the $2 figure] a reasonable figure to use as a rule of thumb per gallon per day as the cost for sewage treatment plant?" Ritke responded, "Well, the cost of a sewage treatment plant, as constructed today, could vary anywhere from $2 to $8. That's from what I can determine, reading the Engineering News Records costs on various plants that are constructed." Thus, the Commission's determination that the $2 figure was appropriate is sufficiently supported by competent evidence.

A second contention made by Metro for reversing the Commission's decision is that the required 500,000 gallons per day of additional capacity must be built at a new plant site and cannot be added by simply expanding the existing north plant as the Commission held. At rehearing, Metro argued that the location of the plant is such that it does not have sufficient area available for expansion. The Commission rejected this argument and cited the August 31, 1988, letter from Robert J. Linenberger, manager of Metro, to the Environmental Protection Agency in support of its holding.

The Linenberger letter was Metro's response in being notified by the Environmental Protection Agency of certain violations existing at the north plant. Metro initially proposed a plan for compliance which would have increased the capacity of the plant by 800,000 gallons per day at the cost of $1.2 million, or $1.50 per gallon per day. Later, in his August 31 letter to the Agency, Linenberger set forth a more detailed proposal for the plant's renovations and additions for increasing the capacity of the plant by 400,000 gallons per day at a cost of $1,375,000, or $3.44 per gallon per day.

■ Metro contends that the Linenberger letter cannot be taken as an "admission" that expansion of the plant is a feasible alternative to building a new one. In support, Metro argues that the August 31 letter was written prior to the Caldwood "contract by which Metro would acquire the additional six acres necessary to complete the new sewage treatment plant site and when Metro had no alternative but do any expansion necessary at the North plant." We find Metro's argument to be without merit. The mere fact that Metro may acquire property on which to build a new plant does not make the existing plant incapable of being expanded.

Further, as the Commission held on rehearing, Metro's argument for building a new plant is premature given that "Metro has not acquired the proposed site of the new STP, filed for EPA permits, attained proper zoning, or come to this Commission for approval of the appropriate Certificate of Public Convenience and Necessity." Thus, expanding the plant appears to be Metro's only option at the present time.

Finally, Metro contends that the $738,000 figure accepted upon rehearing by the Commission as the cost for expanding the plant is unfounded and inadequate. It is not made clear to us from the record as to how King arrived at the $738,000 estimate. Nor is it clear whether this estimate was for expanding the plant by 400,000 gallons per day or 500,000.

■ Metro argues that the Linenberger letter clearly shows that the proposed expansion will cost an estimated $1,375,000. Staff argues that this estimate is an overstatement given that part of the costs in arriving at the estimate can be attributed to correcting Environmental Protection Agency violations and thus should not be financed by a sewer expansion fee. The Commission apparently chose to accept both Staff's argument and proposed estimate. While it is unclear as to how King reached the $738,000 estimate (which is either $1.48 or $1.85 per gallon per day depending on whether the 400,000-gallons-per-day figure is used or the 500,00), it is nonetheless fairly consistent with his original estimate of $2 per day (which would yield somewhere between $800,000 and $1 million). Thus, we find that the evidence was sufficiently substantial for the Commission to rule that the current $2-per-gallon-per-day fee should remain in effect.

■ Metro also contends that the proposed expansion of 400,000 gallons per day is inadequate given that 500,000 gallons are projected as necessary. The 500,000 gallons per day will serve 250 more customers than the 400,000, which will serve 1,000 new customers.

The 500,000 gallon figure, however, was merely an estimate of the company's future needs and was not conclusive. By adding 400,000 gallons per day at a cost of $2 per gallon per day, the north plant should be able to meet its present and future needs for at least the next several years.

Accordingly, the order of the Illinois Commerce Commission is affirmed.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.