THE CITY OF CHICAGO, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee.

First District (2nd Division)   No. 1—94—3781

Opinion filed June 4, 1996.

618

HARTMAN, P.J., specially concurring.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, Stuart Fullerton, and Timothy W. Joranko, Assistant Corporation Counsel, of counsel), for appellant.

Katherine S. Janega, of Rosenthal, Murphy, Coblentz & Janega, and John P. Kelliher, both of Chicago, for appellee.

JUSTICE DiVITO delivered the opinion of the court:

The Illinois Commerce Commission (the Commission) determined that Commonwealth Edison Company (Edison) customers outside the City of Chicago (the City) are treated unfairly by Edison's recovery of the franchise fee it pays to the City, through the general rates it charges all its customers. The Commission therefore ordered Edison to remove local franchise fees and other franchise costs from base rates for all its customers and to localize recovery of those costs by adding a separate line-item charge on the bills of customers who reside in the municipality charging the fee. Under the order, residents of the City are to pay a *pro rata* share of the franchise fee charged to Edison by the City, while residents of other municipalities are to pay their share of franchise costs imposed by their own municipality. At issue in this appeal is whether the Commission's order constitutes rate discrimination. For the reasons that follow, we conclude that it does not.

In 1991, Edison filed a rider which localized recovery of the marginal costs of nonstandard services. *City of Chicago v. Illinois Commerce Comm'n*, 264 Ill. App. 3d 403, 404, 636 N.E.2d 704, 706 (1993). Nonstandard services, such as requiring the burying of transmission lines or the painting of utility poles, are services imposed by local ordinance beyond the services typically offered by Edison. *City of*

*Chicago*, 264 Ill. App. 3d at 404, 636 N.E.2d at 706. At that time, the Commission approved Edison's rider with a modification that the recovery of nonstandard service costs imposed through franchise agreements also be localized. *City of Chicago*, 264 Ill. App. 3d at 406, 636 N.E.2d at 707. The modified rider, which was affirmed on appeal, did not include the fees paid pursuant to franchise agreements. *City of Chicago*, 264 Ill. App. 3d at 406, 636 N.E.2d at 707.

The Commission, however, ordered its staff to conduct an investigation into "restructuring the rates so that any costs imposed upon [Edison] by a local governmental unit, including but not limited to, franchise fees and free and/or reduced rate service, will be recovered solely from those ratepayers within the boundaries of the particular local governmental unit imposing such cost." *City of Chicago*, 264 Ill. App. 3d at 407, 636 N.E.2d at 707. As a result of the staff's recommendation, on August 26, 1992, the Commission issued a citation order commencing proceedings regarding the restructuring proposed here.

Following the issuance of the citation order, many entities, including cities, villages, public interest coalitions, municipal conferences, and public utility companies, intervened or appeared. The City sought to amend the proposed restructuring to include all municipal payment obligations, including property taxes, but that motion was denied. Evidentiary hearings were held on March 10, March 11, and March 14, 1994.

Rita Athas, the executive director of the Northwest Municipal Conferences, testified that franchise compensation comes in two forms: payment to the City of a fee of 4% of Edison's gross receipts and free service to municipalities outside the City. During 1991 and 1992, City residents absorbed less than $15 million incurred from providing free service to municipalities, while customers outside the City absorbed more than $81 million incurred from the franchise fee paid to the City. Thus, customers outside the City made a net payment of approximately $34 million to Edison for its franchise payment to the City in 1991 and just over $33 million in 1992. Athas also testified that, for various reasons, real estate taxes should not be removed from base rates and treated as localized costs.

Thomas Stack, director of the water/sewer program of the Commission's Office of Policy and Planning, testified that the value of free service to the municipalities averaged 0.5% of Edison's revenues within the municipalities receiving that service. The annual cost per customer outside the City to pay for the City franchise fee was $20.51. In his estimation, customers outside the City paid $43,749,906 in 1991 for the franchise fee paid to the City and were consequently be-

ing treated unfairly by the recovery of franchise costs in general rates.

Stack further testified that electricity from a generating station does not go exclusively to customers in the area in which the generating station is located, but may go to customers in a very wide area. For example, the generating station near Kincaid is more than 200 miles from downtown Chicago and is a "mine-mouth" operation that saves coal transportation costs. Yet the power from that plant could supply customers in the City or in many other portions of Edison's service area at various periods of time.

On behalf of the City, Paul Vallas, director of the department of revenue for the City, testified that the City collects compensation for all commercial uses of the public ways and that no user or group is singled out for the obligation. The revenues from franchise fees are deposited into the City's general fund, along with other fee and tax receipts, and are used to provide basic community services. Because of the City's position as a center of commerce, culture, and tourism, many non-Chicagoans enjoy the benefits of the public services. Although Edison has approximately 3,000 miles of facilities in City rights-of-way, the City had not determined the costs attributable to such use.

Ross Hemphill, principal consultant with Analysis Support Network, Inc., testified that the proposed restructuring would discriminate against similar costs of doing business. Franchise fees are indistinguishable from property taxes as costs of doing business. For example, in Ogle and Grundy Counties, Edison's property tax payments subsidize local tax payments. He opined that localizing the recovery of franchise fees and costs would result in residential customers in the City paying as high as $14 million more annually and commercial and industrial customers paying $28 million more.

Edward Bodmer, another consultant with Analysis Support Network, testified that City customers subsidize non-City customers by approximately $311 million annually through franchise costs, property taxes, rate structure, distribution costs, and production costs. That testimony, however, was characterized by Peter Lazare, senior economic analyst for the Commission, as flawed. He testified that Bodmer's analysis divided Edison into two systems, one serving the City and one serving the rest of Edison's service territory. It also used embedded, rather than marginal, costs for rate design purposes, accounted for only 60% of the total distribution costs, contained several mathematical errors, and failed to spread revenues and expenses to all customers.

The 30-page order that is the subject of this appeal was entered

on September 7, 1994. That order, the stated purpose of which was to remedy the unreasonable recovery of franchise fees and free and reduced service imposed on Edison by local governmental units, *inter alia*, directed Edison to reduce base rates for all customer classes on an equal-percentage basis by removing franchise and franchise-type costs and, correspondingly, to add to customer bills a separate line item delineating franchise and franchise-type costs. The City, pursuant to section 10—201(a) of the Public Utilities Act (220 ILCS 5/10—201(a) (West 1992)), appeals from that order.

■ The Commission is given the responsibility of fixing rates of public utilities which will be just and reasonable. *City of Champaign v. Illinois Commerce Comm'n*, 209 Ill. App. 3d 1070, 1075, 568 N.E.2d 438, 441 (1991); 220 ILCS 5/9—201(c) (West 1992). Matters of rate regulation are of legislative character and courts should not interfere with the functions and authority of the Commission so long as its order demonstrates sound and lawful analysis. *City of Chicago*, 264 Ill. App. 3d at 409, 636 N.E.2d at 708.

■ The scope of review is limited to whether: (1) the Commission acted within its authority; (2) the Commission made adequate findings to support its decision; (3) the Commission's decision is supported by substantial evidence; and (4) constitutional rights have been violated. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 55 Ill. 2d 461, 469, 303 N.E.2d 364, 369 (1973); *City of Chicago*, 264 Ill. App. 3d at 408, 636 N.E.2d at 708. Substantial evidence has been defined as " '[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.' " *Metro Utility v. Illinois Commerce Comm'n*, 193 Ill. App. 3d 178, 184, 549 N.E.2d 1327, 1330-31 (1990), *quoting* Black's Law Dictionary 1281 (5th ed. 1979). On review, the Commission's findings of fact are considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof is upon the party appealing from its order. 220 ILCS 5/10—201(d) (West 1992).

I

The City does not dispute that the recovery of franchise payments may be localized. Rather, it contends that if the Commission orders that franchise payment recovery be localized, it must also order the same treatment for the recovery of property taxes. To do otherwise, it asserts, results in rate discrimination because property taxes and franchise fees are sufficiently similar that they must be treated identically.

The City argues that the Commission has not satisfied the ele-

ments of a claim of rate discrimination as identified by *City of Chicago*, 264 Ill. App. 3d at 411, 636 N.E.2d at 709-10. Both the City and the Commission, which adopted this "test," misread *City of Chicago*. There, this court stated:

"Finally, because we believe that the City has failed to carry its burden on appeal, we reject the City's claim that the Commission's order necessarily results in unlawful discrimination. During the course of the proceedings the City failed to submit evidence showing that property taxes significantly varied between areas served by Edison; failed to put on evidence showing that property taxes are sufficiently similar to mandated nonstandard service costs to require that they be treated identically; and failed to put on evidence to indicate that mandated nonstandard services have the result of lowering Edison's long-term costs. Each of these propositions is necessary for the City's claims to prevail." *City of Chicago*, 264 Ill. App. 3d at 411, 636 N.E.2d at 709-10.

This passage was not posited by this court as a test; rather, it was analysis directed to the specific claims that the City had made there. In that case, the City argued three rate discrimination claims: (1) that rate discrimination resulted because the rider at issue unjustifiably distinguished between franchise fees and in-kind services; (2) that nonstandard services were indistinguishable from local property taxes; and (3) that rate discrimination resulted when costs, which in the long run reduced Edison's operating costs, were localized. *City of Chicago*, 264 Ill. App. 3d at 407-08, 636 N.E.2d at 707. Thus, each "prong" from the passage quoted above was simply a parallel response to the City's failure to produce evidence on its claims there, and we decline to accept such analysis as a test which may be extrapolated for use in other cases.

■ Rather, we believe that the test to be applied in determining whether rate discrimination has resulted is whether the differential treatment is reasonable and not arbitrary. *Austin View Civic Ass'n v. City of Palos Heights*, 85 Ill. App. 3d 89, 99, 405 N.E.2d 1256, 1265 (1980). That question is one of fact to be based solely on the evidence presented. *Austin*, 85 Ill. App. 3d at 99, 405 N.E.2d at 1265. Thus, the question presented here is not, as the City contends, whether the Commission has satisfied the "test" in *City of Chicago*, but is whether the difference in rate treatment between franchise fees and property taxes is reasonable and not arbitrary.

■ Although the City contends that the Commission's order fails to articulate a reasoned distinction between local franchise payments and local property taxes, we believe that the Commission has sufficiently articulated a principled basis for its order. The Commission

is not required to make a finding on each evidentiary fact or claim; rather, it is sufficient that its findings are specific enough to permit an intelligent review of its decision. *City of Chicago*, 264 Ill. App. 3d at 409, 636 N.E.2d at 709. If the findings support the order, then the reviewing court examines the evidence to ascertain if the findings are supported by the facts. *Brinker Trucking Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 354, 357, 166 N.E.2d 18, 20 (1960).

Here, the Commission stated in its order:

"This record has detailed some similarities and the many differences between franchise fees and other fees and taxes. These differences are sufficiently unique to merit separate and distinct treatment by the Commission. The undue emphasis on the similarities and differences; [*sic*] however, unnecessarily obfuscates the purpose of this proceeding which is to determine the appropriate regulatory treatment of franchise-type costs."

We conclude that the foregoing provides a sufficient basis for review.

We therefore turn to the question of whether that finding is supported by substantial evidence, which is evidence that a reasoning mind would accept as sufficient to support a particular conclusion. *Metro Utility*, 193 Ill. App. 3d at 184, 549 N.E.2d at 1330-31. The City contends that it is not. There is merit to the City's contention that the Commission failed to indicate why many of its articulated differences between property taxes and franchise fees merit differential treatment.[1] The Commission, however, further stated:

"Chicago's franchise agreement provides overwhelming benefits to Chicago and its ratepayers. As Edison witness Juracek testified, Edison not only will pay the 4% franchise fee, but also will provide $1 billion in distribution and transmission enhancements in Chicago over the next ten years, and will pay for energy audits of certain Chicago buildings. One need only compare the 4% franchise fee of Chicago with the 0.5% franchise-type benefits for municipalities outside Chicago to determine that far greater benefits inure to Chicago. This disparity prevails despite the fact that customers outside Chicago provide two-thirds of Edison's total revenues and most of the energy produced by Edison."

---

[1]The Commission cites the following differences: (1) property taxes are based upon property ownership and value whereas the City's franchise fee is based upon revenue and does not bear any relationship to Edison's use of the City's rights-of-way; (2) franchise fees are utility-specific whereas property taxes apply to all landowners; (3) franchise fees are negotiated whereas property taxes are not; and (4) franchise fees benefit only a municipality whereas property taxes benefit various public bodies.

In other words, the Commission considered that the City and its residents receive not only benefits inuring from nonlocalized payment of the franchise fee but also receive the benefit of energy produced from elsewhere. Thus, the record shows that the Commission considered evidence which indicated that one reason for localizing recovery of franchise fees while not localizing recovery of property taxes is simple fairness based upon the benefit received by Edison customers.

The Commission's emphasis on benefit was appropriate because under Illinois law, the key to allowing localization of the recovery of franchise payments is the focus on the benefit received by the governmental unit at issue: "It would be unjust to spread the burden of this annual franchise payment over the whole northern division. It should be borne by the company's consumers residing within the city as that city alone receives the advantage of such annual payment." *City of Elmhurst v. Western United Gas & Electric Co.*, 363 Ill. 144, 147, 1 N.E.2d 489, 491 (1936); *Village of Maywood v. Illinois Commerce Comm'n*, 23 Ill. 2d 447, 451, 178 N.E.2d 345, 347 (1961); *City of Champaign*, 209 Ill. App. 3d at 1077, 568 N.E.2d at 442.

As the City accurately notes, those cases also stand for the proposition that it is unjust to charge one group of ratepayers for the costs of serving another group. Following the City's own logic, the record here shows that the property taxes paid by Edison are not costs of serving only one local group. For example, the property taxes paid for the generating station located in Kincaid are not paid to provide service only to Kincaid residents. Rather, the taxes paid in Kincaid for the generating plant located there allow Edison to generate power which may be distributed throughout Illinois. Thus, if the Kincaid power plant provided power only to Kincaid residents—just as the franchise fee is paid so that Edison may use the City rights-of-way to provide power only to City residents—localization of the property tax would be proper. However, because Edison customers outside Kincaid reap the benefits of the power plant, property taxes are different from franchise fees. In short, the record shows that franchise fees and property taxes have different purposes: franchise fees are paid so that Edison can distribute power to residents of a particular municipality whereas property taxes are paid so that Edison can distribute power to all its customers. As staff witness Stack stated, "[i]t would make no sense at all to decide to limit recovery of *** property taxes for the generating station to some particular group of customers when customers in general benefit from the generating station."

We believe that a reasoning mind would accept the foregoing as sufficient to support the Commission's conclusion that franchise fees

are reasonably recovered locally whereas property taxes are reasonably recovered in base rates. Accordingly, we conclude that the differential treatment of franchise fees and property taxes is reasonable and not arbitrary, and is supported by substantial evidence.

Also, there is no evidence in the record that the amount of the City's franchise fee bears any relation to the cost to the City for maintenance and protection of the rights-of-way. That fact indicates that the franchise fee is not compensatory in nature, but is a windfall to the City, akin to a tax for revenue which, prior to the Commission's order, was imposed upon persons outside the City and with no representation in the City's political operation.

Moreover, "[s]imply because [the proposed restructuring] fails to simultaneously address every cost-recovery inequality present in Edison's rate structure should not be used as a basis for derailing modifications believed by the Commission to result in improvement." *City of Chicago*, 264 Ill. App. 3d at 411-12, 636 N.E.2d at 710. Here, the Commission believed that the recovery of franchise fees in base rates was unreasonable and that localizing recovery would improve that situation. It concluded that the change was revenue-neutral and would have a high degree of acceptance among the 2 million Edison customers outside the City. In addition, as a practical matter, some of Edison's facilities are located on property outside its service area and therefore have no customers to whom tax payments may be traced. Edison, moreover, pays property taxes to various bodies, including school districts, library districts, townships, mosquito abatement districts, water reclamation districts, highway funds, forest preserve districts, and health departments, many of which are not coterminous with a particular municipality's boundaries. Thus, because the Commission believed that its order improved the existing situation, and there is no basis for a contrary conclusion, the inconsistent treatment of property taxes and franchise fees is not a bar to the modifications in Edison's rate structure.

The City also argues that the Commission failed to address the issue of Edison's expenses for private rights-of-way. The City did not present any evidence regarding the amount or frequency of such payments. Because the City has presented no evidence as to whether such payments are made annually or one time only, the Commission had no basis to determine whether they were analogous to franchise fees, which are paid annually, and thus it was not required to address that issue.

Similarly, the Commission found that the record did not support the City's position on the issue of cross-subsidies. Even if large cross-subsidies exist, however, they are not relevant to this proceeding

because the City has presented no evidence that they are similar to franchise fees and must therefore be treated identically. Again, the Commission's failure to address all inequities in the system does not void its order. *City of Chicago*, 264 Ill. App. 3d at 411-12, 636 N.E.2d at 710. Moreover, the City itself does not argue that all subsidies should be traced. If they were, residents of Ogle, Grundy, and LaSalle Counties would experience in their electric bills annual increases of $700, $500, and $150, respectively.

> "It is seldom that the imposition of a tax or franchise charge does not work a hardship on some individuals. The human race has not yet reached that degree of perfection whereby taxing systems have been evolved which in their practical operation do not, on occasion, work some degree of injustice to some individuals." *City of Elmhurst*, 363 Ill. at 146-47, 1 N.E.2d at 491.

The Commission's order in this case causes a detriment to City residents with a corresponding benefit to Edison customers outside the City. The possible elimination of cross-subsidies is an issue properly presented to the Commission. Their existence does not void the Commission's order.

## II

The City alleges that the Commission, in violation of the prohibition on single-issue ratemaking, unlawfully ordered the use of a rider for recovering Edison's franchise costs. The Commission has the power to authorize riders in a proper case and such authorization will not be reversed absent an abuse of discretion. *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 614, 150 N.E.2d 776, 780 (1958).

■ The amount that a utility is permitted to recover from its customers in the rates it charges is determined by its revenue requirement. *Citizens Utility Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 201, 529 N.E.2d 510, 513 (1988). A company's revenue requirement is the sum of a company's operating costs and the rate of return on its invested capital. *Citizens Utility Co.*, 124 Ill. 2d at 200, 529 N.E.2d at 512. Ratemaking therefore considers costs and earnings in the aggregate because potential changes in one or more items may be offset by changes in other items. *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 325, 620 N.E.2d 1141, 1147 (1993), *appeal denied*, 153 Ill. 2d 557, 624 N.E.2d 804 (1993).

■ Single-issue ratemaking is prohibited because it considers changes in isolation, thereby ignoring potentially offsetting considerations and risking understatement or overstatement of the overall revenue requirement. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 137, 651 N.E.2d 1089, 1102 (1995). A rider,

however, can change a rate without requiring a utility to delay recovery until it files a general rate case. *Citizens Utility Board*, 166 Ill. 2d at 133, 651 N.E.2d at 1100. It is a cost-recovery mechanism which alters an otherwise applicable rate and recovers a specific cost under particular circumstances. *Citizens Utility Board*, 166 Ill. 2d at 133, 651 N.E.2d at 1100.

The City relies on *A. Finkl*, 250 Ill. App. 3d at 327, 620 N.E.2d at 1148, a case which the Commission considered, for the proposition that *only* unexpected, volatile or fluctuating expenses are properly recovered through a rider. *A. Finkl*, however, should not be so narrowly construed. In *A. Finkl*, we stated that "[r]iders are useful in alleviating the burden imposed upon a utility in meeting unexpected, volatile or fluctuating expenses." *A. Finkl*, 250 Ill. App. 3d at 327, 620 N.E.2d at 1148. Nothing in the language of *A. Finkl*, or the case upon which we relied, *Citizens Utility Board*, 13 Ill. 2d at 614, 150 N.E.2d at 780, limits the use of a rider only to those cases where expenses are unexpected, volatile, or fluctuating.

In *Citizens Utility Board*, 13 Ill. 2d at 614, 150 N.E.2d at 780, the supreme court stated that the "Public Utilities Act of Illinois vested in the Commission the power to authorize an automatic adjustment clause to be filed in a rate schedule in the proper case." Although that case dealt with fluctuating costs, its holding was not so limited.

In its most recent pronouncement on this issue, the supreme court held:

> "[A] rider mechanism merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment. The rule does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment." *Citizens Utility Board*, 166 Ill. 2d at 138, 651 N.E.2d at 1102.

The court noted that a rider was appropriate for recovering fluctuating costs; it did not limit the use of a rider only to those instances where costs are unexpected, volatile or fluctuating. *Citizens Utility Board*, 166 Ill. 2d at 138-39, 651 N.E.2d at 1102-03.

■ Riders are closely scrutinized because of the danger of single-issue ratemaking. As the court made clear in *Citizens Utility Board*, single-issue ratemaking is prohibited because of the danger of ignoring some item which might have an impact on the overall revenue

requirement. *Citizens Utility Board*, 166 Ill. 2d at 137, 651 N.E.2d at 1102. Here, however, that danger was not present. The proposed restructuring was exactly that—a reallocation which did not have any impact whatsoever on Edison's overall revenue requirement. The franchise fees were already included in Edison's overall rate structure; the Commission's order simply redistributed them. Because the rider here "merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return" (*Citizens Utility Board*, 166 Ill. 2d at 138, 651 N.E.2d at 1102), it was not an abuse of discretion for the Commission to use it as the mechanism of cost recovery.

The order of the Commission is affirmed.

Affirmed.

BURKE, J., concurs.

PRESIDING JUSTICE HARTMAN, specially concurring:

I concur with the majority decision and write separately to emphasize several points. The record developed before the Commission revealed the City's failure to adduce sufficient and appropriate evidence to support its opposition to the order in question.

The Commission's proceeding investigated restructuring of Edison's rates so that any franchise-type costs imposed on Edison by a unit of local government would be recovered solely from Edison's customers within the geographic confines of the particular unit of local government receiving such compensation. In doing so, the City claims, the Commission's order did not fully consider real estate taxes or payments for private rights-of-way or other costs accrued within individual communities. The City suggests that this omission renders the Commission's order unreasonable and violates the law. The City also argues that utility growth and capital investment in recent years primarily has been for the benefit of suburban communities outside of Chicago.

The City insists that the Commission should not require only Chicago ratepayers to pay for Chicago's franchise fees while continuing to spread other costs imposed on Edison for serving the suburbs to all Edison ratepayers; however, the City has failed to support its argument that franchise fees must be considered in the same category as these other costs imposed on Edison. The concept of cost localization followed by the Commission is neither novel nor new; the City itself concedes that the supreme court has authorized localization of franchise fee cost recovery in the past. *Village of Maywood v.*

*Illinois Commerce Comm'n*, 23 Ill. 2d 447, 178 N.E.2d 345 (1961); *City of Elmhurst v. Western United Gas & Electric Co.*, 363 Ill. 144, 1 N.E.2d 489 (1936). The City was required to introduce evidence to demonstrate why localizing only franchise fees was discriminatory or unreasonable. A review of the record, even in a light most favorable to the City, demonstrates an absence of evidentiary support for any such conclusion.

This court is required to determine whether the decision of the Commission is so flawed that it must be set aside. Our limited powers of review do not give us authority to substitute our judgment for that of the Commission, absent the required evidence which would demonstrate that the determination was unreasonable or in violation of law. The record here is sufficient to support the Commission's order and conclusion, in the absence of countervailing evidence. This is not to suggest that any such evidence does not exist; the City very well may have been able to demonstrate why localizing franchise fees, while continuing to spread other costs, was not reasonable; it has failed to do so in this case. I therefore concur with the majority.