# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People ex rel. Madigan v. Illinois Commerce Comm'n, 2011 IL App (1st) 100654**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, Petitioner, v. ILLINOIS COMMERCE COMMISSION; NORTH SHORE GAS COMPANY, PEOPLES GAS LIGHT & COKE COMPANY; VANGUARD ENERGY SERVICES, LLC; PRAIRIE POINT ENERGY, LLC d/b/a Nicor Advanced Energy LLC; UNITED WORKERS UNION OF AMERICA, AFL-CIO, LOCAL NO. 18007; CONSTELLATION NEW ENERGY, INC., Gas Division; CITIZENS UTILITY BOARD; THE CITY OF CHICAGO; and RETAIL GAS SUPPLIERS, Respondents. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-10-0654, 1-10-0655, 1-10-0936, 1-10-1790, 1-10-1846, 1-10-1852 cons. |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings before the Illinois Commerce Commission on the action of two gas utilities to restructure residential gas rates and gain approval of a special rider for infrastructure improvements, the Commission abused its discretion in approving the rider because the rider constituted single-issue ratemaking without a showing of special circumstances to provide adequate justification, but the Commission's determination of the utilities' operating expenses and rate base would not be disturbed, the Commission did not err in excluding prudent and reasonable pension costs from the rate base, and the Commission did not err in making an adjustment to the utilities' return on equity. |

| Decision Under Review | Petition for review of orders of Illinois Commerce Commission. |
| --- | --- |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Kristin Munsch and Christie R. Hicks, both of Citizens Utility Board, and Lisa Madigan, Attorney General (Michael A. Scodro, Solicitor General, and Paul Berks, Janice A. Dale, and Karen L. Lusson, Assistant Attorneys General, of counsel), both of Chicago, for petitioners. |
| | John P. Ratnaswamy and Carla Scarsella, both of Rooney Rippie & Ratnaswamy LLP, Mary Klyasheff, of Integrys Energy Group, Inc., and Theodore Eidukas, of Foley & Lardner LLP, all of Chicago, and Bradley D. Jackson, of Foley & Lardner LLP, of Madison, Wisconsin, for respondents North Shore Gas Company and Peoples Gas Light & Coke Company. |
| | John P. Kelliher and James E. Weging, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice J. Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1 This consolidated appeal arises from the filing of an action by North Shore Gas Company (North Shore) and Peoples Gas Light and Coke Company (Peoples Gas) (together referred to as the Utilities) with the Illinois Commerce Commission (Commission), which sought to restructure the rates the gas utility companies charged residential customers for the delivery of natural gas and approve a special rider for infrastructure improvements to the utilities' gas delivery system. The Commission entered its final order on January 22, 2010, and a subsequent order on rehearing on June 2, 2010. Several parties involved in the proceedings objected to certain aspects of the Commission's final order and filed appeals, which have been consolidated into the present action before this court.

¶ 2 For the reasons that follow, we affirm the Commission's order in part, reverse in part, and remand the cause for further proceedings consistent with this opinion.

¶ 3                                    BACKGROUND

¶ 4        On February 25, 2009, North Shore and Peoples Gas each filed tariffs with the Commission that consisted of a proposed general increase in natural gas distribution rates, certain new tariff riders, and other tariff revisions. The tariff requests were supported by "prefiled" direct testimony and other material. On March 25 and July 8, 2009, the Commission suspended the proposed rates and initiated contested rate cases to examine the proposed rates and revisions. Several parties intervened, including the parties to this appeal, and an evidentiary hearing was held.

¶ 5        The Commission entered its final dispositive order on January 21, 2010, permanently cancelling previous gas rates and ordering the filing of new tariff sheets. In doing so, the Commission authorized Peoples Gas to file new tariff sheets designed to produce annual revenues of $530,633,000, which represented a gross increase of $69,803,000; and North Shore to file new tariff sheets to produce annual revenues of $79,067,000, which represented a gross increase of $13,867,000. The Commission determined the "just and reasonable" return which Peoples Gas should be allowed to earn on its net original cost rate base is 8.05%, which incorporated a return on common equity of 10.23% and costs of long-term debt of 5.28% with a just and reasonable capital structure of 56% common equity and 44% long-term debt. North Shore's rate of return was set at 8.19%, which incorporated a return on common equity of 10.33% and costs of long-term debt of 5.48% with a just and reasonable capital structure of 56% common equity and 44% long-term debt. In calculating those rates, the Commission denied the gas utilities recovery of certain employee incentive compensation and pension costs. The Commission also approved an "Infrastructure Cost Recovery Rider" (Rider ICR) proposed by Peoples Gas, which consisted of a monthly surcharge on customer bills designed to allow Peoples Gas to recover costs associated with replacing certain additional cast iron and ductile iron gas mains and connecting facilities.

¶ 6        Several parties, including the State of Illinois (the People), the Citizens Utility Board (the CUB) and the Utilities, filed timely applications for rehearing. The Commission granted rehearing to the People and the CUB solely on the limited issue of whether Rider ICR's "baseline" was improperly set. The Commission denied all of the other parties' applications for rehearing. The Commission ultimately approved the Rider ICR baseline that was agreed to by its staff (hereinafter, staff) and Peoples Gas, making only small changes to Rider ICR's audit provisions in its revised order. Several parties filed separate appeals from the Commission's final order, which have been consolidated into the present action pending before this court.


¶ 7                                      ANALYSIS
¶ 8                                 I. Standard of Review
¶ 9        It is well settled that we are required to give substantial deference to the Commission's decisions, in light of its expertise and experience in this area. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009); *Alhambra-Grantfork Telephone Co. v. Illinois Commerce Comm'n*, 358 Ill. App. 3d 818, 821 (2005). The

Commission's "findings of fact are to be considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant." *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 11 (1994). Such deference is "especially appropriate in the area of fixing rates." *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960). Therefore, our review is generally limited to the following matters: (1) whether the Commission acted within its authority; (2) whether it made adequate findings to support its decision; (3) whether the decision was supported by substantial evidence; and (4) whether state or federal constitutional rights were infringed. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514 (citing *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001)). We will not reevaluate the credibility or weight of the evidence, nor substitute our judgment for that of the Commission. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514.

¶ 10                               II. The People's and the CUB's Appeal

¶ 11        Both the People and the CUB appeal from the Commission's decision to approve Rider ICR. The People and CUB contend the Commission abused its discretion by allowing Peoples Gas to recoup what amount to discretionary infrastructure investments through a rider. Specifically, the People and the CUB contend the Commission misunderstood the legal standard that governs its authority to engage in "single issue rulemaking" through a rider. The People and the CUB also contend the record lacks substantial evidence to support the extraordinary rate recovery mechanism of a rider in this case.

¶ 12        The evidence adduced below established Peoples Gas' service territory covers an area of about 237 square miles with a population of approximately 3 million people, serviced by 4,025 miles of gas distribution mains. At the time of the Commission proceeding, approximately half of Peoples Gas' distribution main system was still comprised of cast iron and ductile iron gas mains, which are only able to provide low-pressure gas service. Peoples Gas presented evidence that these aging cast iron ductile iron mains require a higher level of risk management, generate a larger number of leaks and cause a larger number of service outages than modern mains made from polyethylene pipe material would cause.

¶ 13        In 1981, Peoples Gas decided to begin replacing its outdated main system. Peoples Gas estimated the replacement program would not be completed until sometime between 2050 and 2080. Under the current replacement program, Peoples Gas had successfully replaced 1,568 of 4,031 miles of old mains, with an average replacement rate of 45 miles per year through 2008. However, the average annual replacement rate of 45 miles had dropped to 20 miles for 2009 and an estimated 10 miles for 2010 due to the "harsh economic climate," which caused Peoples Gas to decide to preserve its capital rather than expend it on an accelerated main replacement program.

¶ 14        Peoples Gas first sought an infrastructure cost recovery rider in a previous rate case filed in 2007; however, the Commission rejected the request. Although the Commission determined it was within its discretionary powers to authorize the rider, it noted Peoples Gas had failed to establish there was a "need" for such a rider. The Commission's final decision filed on March 25, 2009, identified six standards Peoples Gas had to demonstrate in order

for the Commission to find there is a need for an infrastructure cost recovery rider: (1) a detailed description and cost analysis of the proposed system modernization; (2) an identification, evaluation and justification of the technology involved; (3) a detailed identification and description of the improved functionalities of the modernized system both for the company and for customers; (4) an analysis of the benefits of the system modernization in terms of reduced operating and maintenance costs, enhanced system safety, improved customer safety and reliability, reduced greenhouse gas emissions and increased options for energy efficient appliances, new products and services; (5) an analysis of regulatory mechanisms to allow companies to both recover their costs of system modernization as well as to flow reduced system costs back to customers; and (6) an identification and analysis of legal and regulatory barriers to the implementation of system modernization.

¶ 15    In the rate case at issue here, Peoples Gas again sought an infrastructure cost recovery rider through Rider ICR. Peoples Gas argued the rider did not violate the rule against single-issue ratemaking because it merely facilitates the direct recovery of particular costs in a manner that either has no direct impact on or accounts for any corresponding changes to the components underlying the utility's rate of return so that there is no under or over recovery. In support of its position, Peoples Gas noted the proposed rider included a factor for offsetting any savings generated by the accelerated program, thus preventing any overstatement of the utility's overall revenue requirements by Ride ICR. Peoples Gas also noted the rider had been modified, at the Staff's suggestion, to require re-calculation of the savings factor no less than every three years, with the Commission and other parties retaining the right to initiate proceedings to do so more frequently if deemed necessary.

¶ 16    In support of Rider ICR, Peoples Gas also presented a substantial amount of expert testimony regarding the cost analysis and benefits the improved functionality of the new system would provide to the utility and its customers. Specifically, Peoples Gas provided testimony from Salvatore Marano, a licensed professional engineer, indicating that system modernization would provide several benefits to customers, including enhanced system safety, reduced system costs, potential new products and significant environmental benefits. Marano testified that the new distribution system would provide substantial savings to Peoples Gas' ongoing operations and maintenance costs by reducing the number of leak repairs and safety inspections the utility had to conduct, which would generate a total of $244 million in cost savings. Marano also estimated Peoples Gas' net construction cost savings from accelerating the main replacement program construction through the use of the rider would be $273 million.

¶ 17    Marano further noted that an additional benefit to the City of Chicago (the City) and its residents of accelerating the main replacement program through the use of a rider would be the creation of a substantial number of jobs in the community. Peoples Gas' witness James Schott explained a rider would allow the Utility to proceed with an accelerated main replacement program much more quickly, without the financial uncertainty that accompanies having to wait until the next rate case to recover costs associated with modernizing the system.

¶ 18    The Union representing Peoples Gas' employees who work on the mains on a daily basis

and the City of Chicago also intervened in support of Rider ICR. Although the City recognized Peoples Gas' expert witnesses had not testified the current gas main system was unsafe or in immediate danger, the City noted the magnitude of potential safety issues presented by the antiquated system supported replacing the system as expeditiously as reasonably possible. While the City noted the increased use of riders by utilities threatens effective and thorough regulation of monopoly services, the City argued replacing the old mains as expeditiously as reasonable to ensure public safety presented an extraordinary situation justifying the use of a rider.

¶ 19    The People, the CUB and the Commission's Staff objected to Rider ICR. The People argued the proposed rider should be rejected by the Commission because it constituted improper single-issue ratemaking. The People noted that instead of considering costs and earnings in the aggregate, where potential changes in one or more items of expense or revenue may be offset by increases and decreases in other such items, the Rider ICR proposal only considered changes in infrastructure investment in isolation–ignoring the totality of circumstances. The People noted the capital costs associated with an accelerated main replacement were neither "unexpected, volatile or fluctuating expenses"; nor were the costs authorized by statute.

¶ 20    The People also noted that Peoples Gas had refused to commit to a specific accelerated main replacement plan, that Peoples Gas would not commit to any certain start date on acceleration, and that Peoples Gas would retain control over the schedule of acceleration. The People argued the 2030 completion date Marano testified to was both impractical and unrealistic as a timeline for main replacement. The People also argued Marano's 2030 completion date for main replacement would cost ratepayers over $3 billion more than Peoples Gas' existing 2059 completion date.

¶ 21    Although the CUB did not specifically address the operational need for an accelerated modernization program, it also argued the rider should be rejected given the legal proscriptions against single-issue ratemaking. In support, the People and the CUB's expert witness, Scott Rubin, noted Peoples Gas had failed to show that the existence or absence of Rider ICR would affect its cost of capital, impact its capability to finance necessary improvements, or jeopardize its ability to provide safe and reliable service. The People and the CUB argued Peoples Gas' own historical rate of main replacement investment suggested Rider ICR is simply not needed.

¶ 22    The Staff also argued to the Commission that Rider ICR should be rejected. Although the Staff recognized the Commission has the discretion to approve riders in proper cases as an alternative to the traditional approach of setting rates, the Staff argued Peoples Gas had failed to provide adequate justification for Rider ICR. Although Peoples Gas presented expert testimony that the proposed rider was consistent with the points raised by the Staff and the six standards outlined by the Commission in the last rate case, the Staff's witness explained the Staff's primary position in the previous case was to reject the proposed rider because the need and justification for rider recovery had not been established. The Staff noted the need for an accelerated infrastructure replacement program and the cost recovery mechanism for such a program are two different issues. While the Staff recognized Marano's testimony addressed the need for an accelerated program to replace the current network of

cast iron and ductile iron mains, the Staff noted Marano's testimony did not explain why the use of a rider mechanism to recover costs for that goal would be justified over traditional recovery through base rates.

¶ 23        The Staff's expert witnesses, Sheena Knight-Garlisch and Peter Lazare, both agreed Peoples Gas had not adequately explained why traditional rate case fillings would not allow a prompt and fair rate recovery for the costs associated with modernizing the system. The Staff's witnesses also noted Peoples Gas is seeking funding for an accelerated replacement program that has yet to be developed, which makes it difficult to assess the need for a special recovery mechanism without knowing the Utility's funding needs.

¶ 24        The Commission determined the rule against single-issue ratemaking was not a bar to its adoption of Rider ICR. The Commission also determined the Utility's proposed rider complied with the six standards it had outlined in the earlier rate case. Accordingly, the Commission exercised its legal authority to approve Rider ICR. However, the Commission adopted several of the Staff's recommendations intended to ensure proper regulatory oversight and implementation of the rider.

¶ 25        In reaching its conclusion, the Commission stated "[i]mmediate safety concerns are not what drive our concern." However, the Commission highlighted a more accelerated approach to upgrading the system is needed to prevent or mitigate a foreseeable future risk of system failure, and noted that "accelerated system improvement has become for the Commission a matter of the public interest more so than just a Company proposal." Although the Commission recognized section 8-503 of the Public Utilities Act (Act) (220 ILCS 5/8-503 (West 2008)) would authorize it to require Peoples Gas to undertake and accelerated main replacement program through traditional ratemaking procedures, the Commission noted that to pursue such an action would require it to initiate a new formal proceeding and employ all of its traditional processes to arrive at a decision. Because a burdensome and time-consuming series of rate cases would likely be needed to implement an accelerated program under section 8-503, the Commission held it could exercise its discretionary authority in the most prudent manner by approving Rider ICR.

¶ 26        The amount a utility is permitted to recover from its customers in the rates it charges is determined by its revenue requirement. *City of Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 627 (1996). "A company's revenue requirement is the sum of a company's operating costs and the rate of return on its invested capital." *City of Chicago*, 281 Ill. App. 3d at 627 (citing *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 201 (1988)). Therefore, ratemaking considers costs and earnings in the aggregate because potential changes in one or more items might be offset by changes in other items. *City of Chicago*, 281 Ill. App. 3d at 627 (citing *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 325 (1993) (*Finkl*)).

¶ 27        Single-issue ratemaking is prohibited because it considers changes in particular portions of a utility's revenue requirement in isolation, which ignores potentially offsetting considerations and risks understating or overstating the overall revenue requirement. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 244 (1991) (*BPI*). However, a rider can change a rate without requiring the utility

to delay recovery until it files a general rate case. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 133 (1995).

¶ 28    Our supreme court has recognized a rider mechanism:

"merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment." *Citizens Utility Board*, 166 Ill. 2d at 138.

¶ 29    Our supreme court has also recognized that the single-issue rule "does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment." *Citizens Utility Board*, 166 Ill. 2d at 138. Because the Commission has the power to authorize riders in a proper case, such authorization will not be reversed absent an abuse of discretion. *City of Chicago*, 281 Ill. App. 3d at 627.

¶ 30    In *Finkl*, the Commission approved a rider so the utility could recover costs associated with certain demand-side management programs. The Commission found the rider was the most appropriate method of recovery of the costs, noting "the actual expenses are difficult to predict in advance, especially given the fact that neither the Commission nor [the utility] has extensive experience in the implementation of [demand-side] analysis and programs, and may fluctuate from year to year and from month to month." (Internal quotation marks omitted.) *Finkl*, 250 Ill. App. 3d at 322. This court reversed, holding the rider violated the prohibition against single-issue ratemaking. *Finkl*, 250 Ill. App. 3d at 326. Although the court recognized riders are "useful in alleviating the burden imposed upon a utility in meeting *unexpected, volatile* or *fluctuating* expenses," the court noted the costs involved in the approved rider revealed "no greater potential for unexpected, volatile or fluctuating expenses which [the utility] cannot control, than costs incurred in estimating base ratemaking." (Emphasis in original.) *Finkl*, 250 Ill. App. 3d at 327.

¶ 31    In *Citizens Utility Board*, the CUB contended the utility's use of a rider to recover coal-tar cleanup costs allowed the Commission to approve cost recovery without considering other elements of the revenue requirement formula, ignoring the possibility that a rate increase may not be necessary. In approving the coal-tar cleanup rider at issue, the Commission noted that, given the wide variations and the difficulties in forecasting the costs of investigation and remediation activities, a rider could be expected to provide a more accurate and efficient means of tracking and matching costs with recoveries than would base rate recovery methods. *Citizens Utility Board*, 166 Ill. 2d at 138-39. Numerous witnesses testified to the uncertain and variable nature of the expenses for coal-tar cleanup. *Id*. at 139. Accordingly, our supreme court found that the proposed recovery through a rider mechanism, outside the context of a traditional rate proceeding, did not violate the prohibition against single-issue ratemaking. *Id*.

¶ 32    In *City of Chicago*, we recognized a rider is appropriate for recovering fluctuating costs; however, we rejected the proposition that only unexpected, volatile or fluctuating expenses are properly recovered through a rider. *City of Chicago*, 281 Ill. App. 3d at 628 (citing

-8-

*Citizens Utility Board*, 166 Ill. 2d at 138-39). The Commission approved the use of a rider in order for the utility to recover its franchise-type fees and costs. Although this court recognized riders should be closely scrutinized because of the danger of single-issue ratemaking, we found such a danger was not present in the case before us. *City of Chicago*, 281 Ill. App. 3d at 628-29. The court held the "proposed restructuring was exactly that–a reallocation which did not have any impact whatsoever on [the utility's] overall revenue requirement." *Id.* at 629. The court noted the franchise fees were already included in the utility's overall rate structure; the Commission's order simply redistributed them. *Id.* "Because the rider here 'merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return' (*Citizens Utility Board*, 166 Ill. 2d at 138, 651 N.E.2d at 1102), it was not an abuse of discretion for the Commission to use it as the mechanism of cost recovery." *Id*.

¶ 33    By contrast, in *Commonwealth Edison Co.*, 405 Ill. App. 3d at 414-15, *appeal denied*, No. 111548, 949 N.E.2d 657 (Ill. Mar. 30, 2011) (table), the Second District considered the People's and the CUB's contentions that a Commission-approved provision known as "Rider SMP" was contrary to settled ratemaking principles and not justified by the evidence. ComEd, the utility, proposed Rider SMP, which consisted of a "system modernization project" charge to customers, in order to immediately recoup the costs of modernizing its electricity delivery system toward a "smart grid." In support of the rider, ComEd presented testimony that a smart grid would achieve cost savings and improve efficiency by phasing out 675 full-time meter readers and supervisor positions, eliminating meter reading equipment, improving bill collections, reducing billing errors and disconnecting nonpaying customers more efficiently. ComEd argued to the Commission that Rider SMP would give customers the benefits of the smart grid technology earlier than might otherwise occur, because ComEd could not afford the project without the rider.

¶ 34    The court recognized that because a rider, by nature, is a method of single-issue ratemaking, it is not allowed absent a showing of exceptional circumstances. *Commonwealth Edison Co.*, 405 Ill. App. 3d at 415 (citing *Finkl*, 250 Ill. App. 3d at 327). After analyzing the prior decisions in *Finkl*, *City of Chicago* and *Citizens Utility Board*, the Second District gleaned a guiding principle for testing a rider's validity:

> "[T]he Commission has discretion to approve a utility's proposed rider mechanism to recover a particular cost if (1) the cost is imposed upon the utility by an external circumstance over which the utility has no control and (2) the cost does not affect the utility's revenue requirement. In other words, a rider is appropriate only if the utility cannot influence the cost [citation] and the expense is a pass-through item that does not change other expenses or increase income [citation]." *Id.* at 414 (citing *Citizens Utility Board*, 166 Ill. 2d at 138).

¶ 35    The court held its test reconciled the approval of diverse riders, including: "(1) a rider to recoup increases in the wholesale cost of natural gas, *** [citation]; (2) a rider to recoup expenses for government-mandated environmental remediation [citations]; and (3) a rider to recoup a franchise fee that a municipality charges the utility [citation]." *Id*. (citing *Citizens Utility Board*, 166 Ill. 2d at 138-39, *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 614 (1958), and *City of Chicago*, 281 Ill. App. 3d at 628-29). The court recognized

that in each instance noted above, the expense included in the rider was an externality imposed on the utility, and, therefore, the expense was properly passed directly on to the consumer through a rider without affecting the utility's actual return on investment. *Id*. The Second District also noted its test explained the rejection of the rider in *Finkl* for demand-side management expenses, where this court held the rider was invalid because the expenses were something completely within the utility's control. *Id.* (citing *Finkl*, 250 Ill. App. 3d at 326).

¶ 36    The court held Rider SMP did not meet its criteria to warrant appropriate single-issue ratemaking because: (1) the expenses related to upgrading to smart grid technology were not "unexpected, volatile, or fluctuating," as ComEd alone dictated the program's scope and, therefore, its costs; (2) the capital costs associated with the upgrades were not the result of a legislative mandate but rather were the result of ComEd's decision to renovate to reduce other costs; (3) ComEd can cover the expenses by a fiscal and operational plan that is completely within the utility's control; and (4) the Commission heard no evidence that the system modernization costs might produce unacceptable financial outcomes if not afforded special treatment. *Commonwealth Edison Co.*, 405 Ill. App. 3d at 414-15. Precisely because the improvements covered by Rider SMP were expected to reduce other expenses and increase income in the long term, which would affect the utility's revenue requirement, the court held to allow Rider SMP would be to improperly consider in isolation changes in a particular portion of a utility's revenue requirement. *Id*. at 415 (citing *BPI*, 146 Ill. 2d at 244). Accordingly, the court concluded that the Commission abused its discretion and reversed Rider SMP, finding the rider constituted improper single-issue ratemaking that was not justified by any special circumstances. *Id*. In support, the court noted "[t]he evidence showed that ComEd historically has invested in capital distribution improvements and recouped those costs through traditional ratemaking procedures, and the system modernization program should be treated no differently." *Id.*

¶ 37    In this case, Peoples Gas and the Commission stress the real issue is whether the cost recovery mechanism facilitates cost recovery without directly impacting the utility's rate of return. See *Citizens Utility Board*, 166 Ill. 2d at 138. The Commission notes that by removing the cost of the modernization from base rates and recovering it on a dollar-by-dollar basis through a rider, the remaining base rates, together with the costs recovered through rider, are still designed to generate enough revenue to allow the utility to pay its bills and obtain the same rate of return as established in the rate case. The Commission suggests this evidences the fact that the rider would not impact Peoples Gas' rate of return. If Rider ICR was simply a reallocation of costs that had no direct impact on the utility's rate of return, the Commission would not have abused its discretion in approving the rider. See *City of Chicago*, 281 Ill. App. 3d at 628-29 ("Because the rider here 'merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return' (*Citizens Utility Board*, 166 Ill. 2d at 138, 651 N.E.2d at 1102), it was not an abuse of discretion for the Commission to use it as a mechanism of cost recovery.").

¶ 38    The People and the CUB counter that the costs covered by Rider ICR do impact the utility's rate of return. Specifically, the People and the CUB note the evidence in the record establishes that over a 49-year period, Rider ICR would increase Peoples Gas' revenue

requirement substantially. The People argue that any increase in the revenue requirement "creates a proportional increase in the return on that investment" (see *Citizens Utility Board*, 166 Ill. 2d at 137), which in turn would have a direct impact on the utility's rate of return.

¶ 39 We note the record reflects that a witness for the People and the CUB, Mr. Rubin, testified the net effect Rider ICR would have on Peoples Gas' revenue requirement would be to increase it by $3 billion over what it would have been under the existing main replacement program. However, Peoples Gas notes that Mr. Rubin admitted on cross-examination that if his analysis was carried out until the capital investments were completely depreciated for both programs, Peoples Gas' current main replacement program would in fact generate an overall larger revenue requirement than the accelerated main replacement program would.

¶ 40 In light of *Commonwealth Edison Co*, we find Rider ICR does not meet the criteria necessary to warrant appropriate single-issue ratemaking. Similar to Rider SMP, the rider at issue here does not include recovery of costs that are necessarily "unexpected, volatile, or fluctuating," as Peoples Gas alone dictates the program's scope and, therefore, its ultimate cost. Rider ICR is also not intended to recoup expenses for government-mandated environmental remediation; nor are the costs the result of a legislative mandate. Instead, the costs covered by Rider ICR are for capital improvements to Peoples Gas' natural gas delivery system that are likely to have a direct impact on the utility's actual rate of return.

¶ 41 Moreover, similar to Rider SMP, the Staff witnesses' testimony below suggests the costs associated with an accelerated main replacement program under Rider ICR could be recovered through traditional ratemaking procedures. As the People's expert witness noted, Peoples Gas' own historical rate of main replacement investment indicates the costs associated with the improvements were previously able to be recovered through traditional rate cases, without the need to resort to a special rider cost recovery mechanism. Although the Staff's expert witnesses conceded below that acceleration of the main replacement program was in the public's best interests, the Staff's evidence also indicated that traditional ratemaking procedures provide an acceptable avenue to pursue such a goal without requiring the use of a rider. In fact, the Commission's order itself specifically notes the Commission could have required Peoples Gas to undertake an accelerated main replacement program under section 8-503 of the Act while utilizing traditional ratemaking procedures. While traditional ratemaking procedures may constitute a burdensome and time-consuming process in the Commission's eyes, a desire to streamline that legislatively created process alone does not constitute a showing of the type exceptional circumstances necessary to justify the use of a rider. See *Commonwealth Edison Co.*, 405 Ill. App. 3d at 415 (citing *Finkl*, 250 Ill. App. 3d at 327).

¶ 42 Accordingly, under the standards set out by the Second District in *Commonwealth Edison Co.*, we find the Commission abused its discretion in approving Rider ICR because the rider constituted single-issue ratemaking that was not adequately justified by any special circumstances. See *Commonwealth Edison Co.*, 405 Ill. App. 3d at 415 ("The evidence showed that ComEd historically has invested in capital distribution improvements and recouped those costs through traditional ratemaking procedures, and the system modernization program should be treated no differently.").

-11-

¶ 43                              III. The Utilities' Appeal

¶ 44    The Utilities contend the Commission erred in determining the Utilities' operating expenses and rate base. Specifically, the Utilities contend the Commission committed reversible error by: (1) denying the Utilities the full recovery of their prudent and reasonable employee incentive compensation costs; (2) calculating the Utilities' costs of capital by making unwarranted and duplicative reductions in the Utilities' approved rate of return on common equity; and (3) denying Peoples Gas the full recovery of its prudent and reasonable pension costs. Each of the alleged errors is addressed in turn below.

¶ 45                              A. Incentive Compensation Costs

¶ 46    The Utilities contend the Commission erred by disallowing almost all of the Utilities' prudent and reasonable employee incentive compensation costs. Specifically, the Utilities contend the Commission erred by: (1) unlawfully disallowing the Utilities' employee incentive compensation costs despite uncontradicted evidence of, and no dispute regarding, the prudence and reasonableness of the costs; (2) applying an invalid Commission-created direct customer benefits standard that improperly disallowed prudent and reasonable incentive compensation costs; and (3) applying a standard that arbitrarily and capriciously picked what customer benefits count to allow cost recovery while disregarding other customer benefits.

¶ 47    Here, the Utilities' primary witness regrading employee incentive compensation costs, James Hoover, testified that the Utilities design their total cash compensation packages at market median based on data collected from other energy service companies, that the Utilities design their total compensation programs, including their incentive compensation programs, in order to attract and retain a sufficient, qualified and motivated work force, and that attracting and retaining such a work force benefits customers by making sure there are enough workers to perform needed work, by maintaining and improving the quality of work and by reducing the expenses associated with recruiting and retaining new employees. Hoover also testified the employee stock plans were an important part of the overall compensation package that was designed to help attract and retain a qualified and motivated work force.

¶ 48    The Commission ultimately agreed with the Staff's recommendation that incentive compensation that was related to financial goals, affiliate goals or shareholder goals should not be recoverable from ratepayers. The Commission found Hoover's testimony did not "demonstrate a sufficient nexus between the expense and customer benefit." The Commission agreed with the People's witness that when incentive compensation seeks to achieve goals that primarily benefit shareholders, then it is reasonable to require that shareholders bear the cost of that incentive compensation. The Commission concluded attracting good employees is too remote a benefit for ratepayers to support recovery.

¶ 49    Illinois courts have recognized costs are generally recoverable from ratepayers if the costs are reasonable and prudent. *BPI*, 146 Ill. 2d at 247. Generally, reasonable and prudent expenditures for salaries should also be included in the rate base. *Villages of Milford v.*

*Illinois Commerce Comm'n*, 20 Ill. 2d 556, 566 (1960). The Utilities contend the "reasonable and prudent" standard is the only standard they had to satisfy in order for the employee incentive compensation costs to be included in its rate base, citing *Citizens Utility Board*, 166 Ill. 2d at 121 ("In setting rates, the Commission must determine that the rates accurately reflect the cost of service delivery and must allow the utility to recover costs prudently and reasonably incurred.").

¶ 50    Moreover, the Utilities note that none of the Staff's or the People's witnesses challenged Hoover's testimony that the Utilities' employee incentive costs were reasonable and prudent, and that the costs benefitted customers. The Utilities contend "[w]here the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded by the trier of fact." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 51    Contrary to the Utilities' contention, we find Illinois law supports the Commission's use of a direct benefit standard in denying 90% of Peoples Gas' and 93% of North Shore's employee incentive compensation costs.

¶ 52    In *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510 (2009), *appeal denied*, 237 Ill. 2d 554 (2010), the Commission ruled that the utility, ComEd, did not demonstrate a sufficient nexus between the earnings-per-share portion of the employee incentive compensation plan and a benefit to ratepayers. In affirming the Commission's decision, the court noted that although reasonable and prudent expenditures for salaries are generally included in the rate base, under certain circumstances it has been held that the cost of salaries should be apportioned between shareholders and ratepayers. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 517 (citing *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550, 560-61 (1971), *Villages of Milford*, 20 Ill. 2d at 566, and *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n*, 122 Ill. App. 3d 219, 226 (1983)). Accordingly, the court noted there is "ample precedent making a benefit to ratepayers a condition upon which the recovery of salary-related expense depends." *Commonwealth Edison Co.*, 398 Ill. App. 3d at 517. Moreover, the court noted the Act itself makes room for considerations beyond simply whether an expenditure is reasonable and prudent. *Id*. at 516 (citing 220 ILCS 5/16-108(c) (West 2004) ("Charges for delivery services shall be cost based, and shall allow the electric utility to recover the costs of providing delivery services through its charges to its delivery service customers that use the facilities and services associated with such costs.")). The court also noted the utility bears the burden of proof on this issue when it is litigated before the Commission. *Id*. at 515 (citing *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 746 (1995)).

¶ 53    In support of its contention that the incentive plan benefitted ratepayers, ComEd cited testimony from its expert witness that incentive plans benefit everyone, including customers, because as "productivity rises, more attention is paid to cost control and more focus is given to customer service." (Internal quotation marks omitted.) *Id.* The court noted that while the evidence certainly provided support for the utility's position, it did not compel the conclusion the utility sought. *Id*. The court rejected the utility's argument that the incentive plan benefitted ratepayers in the sense that attracting good employees raises the level of service customers will receive, finding such a benefit is "too remote." *Id*. Since the record did not

establish the cost-cutting measures included in the incentive plan necessarily benefitted ratepayers, the court held the utility had not demonstrated the Commission erred in disallowing the costs. *Id*. at 519. The court noted that because other performance-based components of the incentive plan existed, the Commission could have reasonably concluded that the earnings-per-share portion of the plan provided only a tangential benefit to ratepayers. *Id*. The court recognized the notion that an earnings-per-share-based employee incentive plan provides benefits to shareholders was hardly a controversial position. *Id*.

¶ 54      In this case, similar to *Commonwealth Edison Co.*, the Commission determined incentive compensation related to financial goals, affiliate goals or shareholder goals should not be recoverable. Although the Commission accepted Hoover's testimony that the plans were designed to attract and retain highly qualified and motivated employees, the Commission determined such reasoning did not demonstrate a sufficient nexus between the expense and the customer benefit. The Commission agreed with the People's witness that when incentive compensation seeks to achieve goals that primarily benefit shareholders, then it is reasonable to require that shareholders bear the cost of that incentive compensation.

¶ 55      Contrary to Peoples Gas' contentions on appeal, both the Act and Illinois case law clearly reflect the direct customer benefit standard was an appropriate standard for the Commission to apply in this case. See *Commonwealth Edison Co.*, 398 Ill. App. 3d at 519. Because the Commission's expertise in these matters entitles its decisions to great deference on review, we will not reevaluate the credibility or weight of the evidence, nor substitute our judgment for that of the Commission. See *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514. Accordingly, we see no reason to disturb the Commission's findings based on the record before us. *Id*.

¶ 56                            B. Pension Plan Costs

¶ 57      Peoples Gas also contends the Commission erred by excluding its prudent and reasonable pension costs from the rate base. Specifically, Peoples Gas contends the Commission erred in agreeing with the Staff's and the People's proposal that Peoples Gas' pension asset be excluded from the rate base on the theory that the asset was established by ratepayer-supplied funds.

¶ 58      Initially, we note Peoples Gas' attempt to obtain recovery of the pension asset in its previous rate case filed in 2007 was also denied by the Commission. Peoples Gas' appeal from that denial is still pending before the Second District.

¶ 59      For ratemaking purposes, the Commission notes a utility generally may not receive a return on investment from ratepayers for ratepayer-supplied funds. See *Business & Professional People for the Public Interest v. Commerce Comm'n*, 146 Ill. 2d 175, 258 (1991); *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550, 554-58 (1971); *City of Alton v. Illinois Commerce Comm'n*, 19 Ill. 2d 76, 85-91 (1960); *Central Illinois Light Co. v. Commerce Comm'n*, 252 Ill. App. 3d 577, 583 (1993).

¶ 60      During the hearing before the Commission in this case, Peoples Gas argued there was no evidence indicating customers funded the pension asset.

¶ 61      Alan Felsenthal, the Utilities' primary witness on this issue, explained the pension asset

consisted of direct contributions by Peoples Gas shareholders and/or negative pension expenses–in both cases, investor-supplied funding. Felsenthal explained a negative pension expense results either from the expected return on prepaid plan assets exceeding other components of pension cost, or from some of the pension plan participants accepting lump-sum distributions in lieu of pension plan benefits. Felsenthal testified that for the eight-year period between 1998 and 2003, Peoples Gas had a negative pension expense totaling $174.3 million. Felsenthal testified Peoples Gas' pension asset is the cumulative difference between what has been contributed to the pension plan by Peoples Gas using investor-supplied funds and what has been expensed under the applicable accounting standards.

¶ 62    Felsenthal further explained that because the ratemaking process is based on the utility's expenses, the prepaid pension asset represents amounts that have been contributed by Peoples Gas to the pension fund that have not been recovered from ratepayers or that have been treated as a negative pension expense. Felsenthal testified customers benefit from negative pension expenses because they reduce operating expenses and reduce the need for additional rate cases. Felsenthal explained negative pension expenses benefit investors only to the extent the expenses reduce cash funding requirements since gains or returns realized on pension fund investments must stay in the pension fund. Because the Commission has not allowed Peoples Gas to include its pension asset in the rate base, investors have not been allowed to earn a return on their investment. Felsenthal stressed there was no evidence indicating customers funded the pension asset.

¶ 63    Both the People and the Commission's Staff disagreed with Peoples Gas' argument that the pension asset was created with funds supplied by shareholders, not ratepayers. The Staff argued the pension asset was created with contributions using monies supplied by ratepayers through the collection of utility rates. Since the pension asset was funded by normal operations, rather than provided by shareholders, the Staff argued shareholders should not be allowed to earn a return on it.

¶ 64    The Commission determined that although Peoples Gas argued the pension asset was created with shareholder funds, no evidentiary support was provided. Accordingly, the Commission found no support in the record to allow for the inclusion of Peoples Gas' pension asset in the rate base, which would have the effect of allowing shareholders to earn a return on ratepayer supplied funds.

¶ 65    Peoples Gas contends on appeal that our supreme court has previously rejected a claim that a utility's rate base should be reduced on the theory that part of it was the product of consumer-supplied funds, citing *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195 (1998).

¶ 66    In *Citizens Utility Co.*, the utility operated what is known as a "contract plant." The question presented in the case arose from the different treatment accorded a contract plant for tax purposes and for ratemaking purposes. When computing its federal income taxes, the utility was allowed to deduct the depreciation in value of the contract plant, reducing the amount of income taxes it was required to pay. When computing its income tax expense for rate making purposes, however, the utility did not factor in the depreciation deduction, and therefore its income tax expense for ratemaking purposes was higher than what the utility

-15-

actually paid the federal government. The higher tax expense figure was used in ratemaking cases for the years 1958 through 1982, netting a total of $4,657,385 in tax benefits. When the error was discovered by the Commission in the utility's 1983 rate case, the Commission ordered that $403,432 in tax depreciation expense for the 1983 test year be deducted from the utility's taxable income. The Commission also ordered the balance of the past benefits, $4,253,953, be deducted from the utility's rate base. The utility appealed, contending the $4.2 million rate base reduction was invalid as retroactive ratemaking.

¶ 67    The supreme court held the real effect, whether intended or not, of the $4.2 million reduction in the utility's rate base was to deny retroactively the tax benefits the Commission permitted the utility to enjoy during the period from 1958 to 1982. *Citizens Utilities Co. of Illinois*, 124 Ill. 2d at 206-07. The court held such action clearly conflicted with fundamental principals of ratemaking in Illinois. *Id*. at 207. In reaching its conclusion, the supreme court rejected the Commission's contention that the $4.2 million reduction could be justified on the ground that the reduction was necessary to prevent the company from earning a return on non-investor-supplied capital. *Id.* at 211. The Commission believed that even though the tax benefits did not become a discrete component of the utility's rate base, they represented customer-supplied funds, and, therefore, the utility's receipt of them necessitated an offsetting reduction in rate base. See *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151 (1934); *City of Alton*, 19 Ill. 2d 76. The supreme court noted, however, that the amounts at issue before it were already recovered by the utility in past ratemaking orders as part of its income tax expense, and the validity of those orders cannot now be questioned. *Citizens Utilities Co. of Illinois*, 124 Ill. 2d at 212. The court also noted that although the Commission order contained language suggesting that the tax benefits were non-investor-supplied capital, the order did not state that a reduction would be necessary to prevent the company from earning a return on those sums in the future. *Id*. at 205.

¶ 68    In this case, unlike *Citizens Utilities Co*., the Commission's actions in determining Peoples Gas' pension asset should not be included in the rate did not constitute retroactive ratemaking. The Commission is not attempting to correct for a past error of omission by deducting the pension asset from the rate base. Instead, the Commission's decision is based solely on what impact the pension asset should have on Peoples Gas' current rate base, assuming the asset consists of customer-supplied funds. Because we are not faced with a retroactive ratemaking situation in this case, we find *Citizens Utilities Co.* provides little guidance as to how to resolve the actual issue pending before us.

¶ 69    The central issue before us remains whether the Commission's decision to exclude the pension asset, which it found consisted of consumer-supplied funds, from Peoples Gas' rate base was against the manifest weight of the evidence. Both the Staff's and the People's expert witness testified the pension asset constituted customer-supplied revenues and, therefore, should be deducted from the rate base calculation.

¶ 70    Although Peoples Gas' expert witness obviously disagreed with that assessment and testified the pension asset was generated solely form shareholder revenue, we note the credibility of expert witnesses and the weight to be given their testimony are generally matters for the Commission to determine as the finder of fact. See *Lefton Iron & Metal Co. v. Illinois Commerce Comm'n*, 174 Ill. App. 3d 1049, 1060 (1988). "Decisions of the

-16-

Commission are entitled to great deference because they arise out of the deliberations of members who are much better qualified to interpret evidence supplied by specialists and technicians." *Id*. Accordingly, we must refrain from reevaluating the credibility or weight of the evidence, or from substituting our judgment for that of the Commission unless the Commission's judgment was clearly against the manifest weight of the evidence. See *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514.

¶ 71    Based on the record before us, we find the Commission's decision with regard to the pension asset deduction is not clearly against the manifest weight of the evidence. Accordingly, we see no reason to disturb the Commission's findings.

¶ 72                                C. Market-Based Rate of Return

¶ 73    The Utilities contend the Commission erred in adjusting the Utilities' market-based rate of return on equity (ROE). Specifically, the Utilities contend the Commission's adjustments to the Utilities' market-based ROE not supported by substantial evidence, and was arbitrary, capricious and punitive.

¶ 74    In setting a utility's ROE, the Commission is tasked with evaluating the employment of financial models that quantify the likely cost of attracting capital investment during the times that the rates will be in effect. Because the Utilities' stock is not publicly traded, the financial models were applied to a proxy group of publicly traded natural gas utilities with risk profiles identified to be similar to those of Peoples Gas and North Shore Gas. The Commission noted the Utilities' expert witness used a constant growth discount cash flow (DCF) model to determine a ROE estimate of 10.67%. The Staff's expert used a non-constant DCF model to determine a ROE estimate; however, the Commission disregarded the Staff's non-constant DCF model because its use was unsupported by the evidentiary record. The Commission determined it was clear in the evidentiary record that if the Staff had used a constant DCF model, the unadjusted ROE estimate would have been 11.76%. The Commission determined the most reasonable approach was to average the Staff's unadjusted estimate of 11.76% and the Utilities' unadjusted estimate of 10.67%, which averaged to a 10.73% estimated ROE. The Commission then made two types of downward adjustments to the ROE estimates, which equaled an authorized ROE of 10.33% for North Shore and 10.23% for Peoples Gas.

¶ 75    The first adjustment was based on a "financial risk adjustment" of 30 basis points for Peoples Gas and 20 basis points for North Shore. The Staff's expert witness, Michael McNally, explained the Utilities had less financial risk than the publicly traded utilities in the proxy group. In order to determine the risk differential, McNally explained he compared the proxy group's average actual credit rating to hypothetical credit ratings he estimated the Utilities would have if they recovered their revenue requirements in full. Finding the Utilities' hypothetical credit ratings based on full revenue recovery were higher than the proxy group's average actual credit rating, McNally and the Staff recommended the deductions adopted by the Commission above. The second adjustment was based on 10-point downward adjustments for each of two tariff riders approved by the Commission, Rider UEA and Rider VBA.

¶ 76    Our supreme court has noted a utility's revenue requirement is based on a calculation of

-17-

the utility's:

> "operating costs, rate base, and allowed rate of return. A public utility is entitled to recover in its rates certain operating costs. A public utility is also entitled to earn a return on its rate base, or the amount of its invested capital; the return is the product of the allowed rate of return and rate base. The sum of those amounts–operating costs and return on rate base–is known as the company's revenue requirement. The components of ratemaking determination may be expressed in the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital). *** The revenue requirement represents the amount the company is permitted to recover from its customers in the rates it charges." (Internal quotation marks omitted.) *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988).

¶ 77                          1. Financial Risk Adjustment

¶ 78    The Utilities contend the financial risk adjustment to the Utilities' ROE should be reversed. Specifically, the Utilities contend the adjustments were based on improper assumptions and an improper comparison between the Utilities' ideal financial performance and the proxy group's actual financial performance. The Utilities contend there was no basis for the Commission to consider comparisons between the Utilities and the proxy group for specific risk differentials. The Utilities note that for purposes of calculating the Utilities' ROE through financial models, the Commission accepted the gas group proxy as a reasonable proxy for the overall investment risk associated with the Utilities. Accordingly, the Utilities contend the Commission's consideration of a comparison specific to financial risk was improper because the Commission did not also take into account other risk variations that may have offset any differences in financial risk.

¶ 79    The Utilities also contend it was patently unfair and an abuse of discretion for the Commission to assume full recovery of the revenue requirements when comparing the Utilities' future financial performance with the actual average credit rating of the proxy group utilities. The Utilities contend their actual earnings are inherently uncertain because their rates are based on estimated revenue requirements. In support, the Utilities note they have significantly under recovered their revenue requirements in the past. In 2008, for example, Peoples Gas earned a return of 5.65% compared to its 10.19% authorized return, while North Shore earned 6.66% compared to its authorized return of 9.99%. Accordingly, the Utilities contend the Commission grossly overstated their projected financial performance and understated their financial risk when making the adjustments.

¶ 80    The Commission counters that it accepted the Staff's testimony that the financial risk of the Utilities is lower than that of the proxy group. The Commission contends the purpose of the adjustment was to reflect the fact that the Utilities have, and will continue to have, in place several risk reducing factors that not all companies in the proxy group have. The Commission notes the Utilities' own expert witness acknowledged that fact during the hearing. Noting the proxy continues to be both theoretical and a matter of opinion, the Commission contends the Utilities have not shown an opposite conclusion to the

Commission's decision to adjust the ROE was "clearly evident." See *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994) ("On appeal from an order of the Commission, the appellant bears the burden of proving that it was not supported by substantial evidence. (220 ILCS 5/10-201(d), (e)(iv) (West 1992)). This standard is not met by merely showing that the evidence may support a different conclusion; it must be shown that the opposite conclusion is clearly evident.").

¶ 81    The Commission's findings of fact are to be considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant. See *United Cities Gas Co.*, 163 Ill. 2d at 11. After reviewing the record below, we agree it was proper for the Commission to accept the Staff's expert testimony that the financial risk of the Utilities at issue here is lower than that of the proxy group. Because we conclude the Utilities have failed to demonstrate an opposite conclusion regarding the Commission's financial risk adjustment is clearly evident, we find the Commission did not err in making the adjustment to the Utilities' estimated ROE. See *Continental Mobile Telephone Co.*, 269 Ill. App. 3d at 171.

¶ 82                                    2. Rider Adjustment

¶ 83    Initially, we note a similar issue regarding an adjustment to the Utilities estimated ROE based on Rider VBA in its 2007 rate case is currently pending on appeal before the Second District.

¶ 84    The Utilities contend the additional 10-point adjustment to the ROE for Rider VBA, which was designed to ensure accurate recovery of the Utilities "margin" revenues regardless of how weather affected the Utilities' sales of natural gas, and the 10-point adjustment to the ROE for Rider UEA, which was designed to ensure recovery of the Utilities' uncollectible expenses, were duplicative and unnecessary. The Utilities note that to the extent the riders increase the likelihood that the Utilities would recover a greater portion of their future revenue requirements as compared to the proxy group, the Commission already assumed the Utilities would recover their future revenue requirements in full when it made the financial risk adjustment discussed above. Simply put, the Utilities suggest the adjustments for the riders double counted the alleged risk differential between the Utilities and the proxy group that the adjustments were designed to offset. The Utilities contend that the financial risk adjustments, in effect, assumed the existence of a "super rider" that would ensure the Utilities would earn their full revenue requirement regardless of any contingencies.

¶ 85    The Commission counters its decision to lower the ROE based on the rider was properly based on the evidence presented by McNally, the Staff's expert witness on the issue. The Commission also disagrees with the Utilities' contention that the risk adjustment was designed to remove all risk that a utility will be unable to recover its revenue requirement in full. In support, the Commission notes that under cost-based ratemaking, the authorized return on common equity is set equal to the investor required return, which is revealed through the price investors are willing to pay for that common stock. The Commission contends a ROE cannot be determined by past achieved returns alone.

¶ 86    The Commission also notes determining an appropriate cost of common equity is not a

matter of formula, but, instead, is a question of pragmatic business judgment to which the Commission's decision is entitled to great weight. See *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960).

¶ 87   We must agree with the Commission in this instance. As previously noted, we will not reevaluate the credibility or weight of the evidence on review; nor will we substitute our judgment for that of the Commission. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514. Such deference is "especially appropriate in the area of fixing rates." *Iowa-Illinois Gas & Electric Co.*, 19 Ill. 2d at 442. Because we determine the Utilities have failed to demonstrate an opposite conclusion regarding the Commission's rider adjustment is clearly evident, we find the Commission did not err in making the adjustment to the Utilities' estimated ROE.

¶ 88                                    CONCLUSION

¶ 89   We affirm the Commission's order in part, reverse the order in part, and remand for further proceedings consistent with this opinion.

¶ 90   Affirmed in part and reversed in part; cause remanded.